NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-08737


COMMONWEALTH  vs.  DANIEL L. HOLLAND.



Norfolk.     November 10, 2016. - April 19, 2017.

Present:  Gants, C.J., Lenk, Hines, Gaziano, & Lowy, JJ.


Homicide.  Armed Home Invasion.  Constitutional Law, Assistance
    of counsel, Fair trial.  Practice, Criminal, Capital case,
    Postconviction relief, Assistance of counsel, Fair trial,
    Comment by judge.  Mental Impairment.  Insanity.



Indictments found and returned in the Superior Court
Department on November 18, 1998.

The cases were tried before Thomas E. Connolly, J., and
motions for a new trial, filed on April 3, 2006, and December
18, 2008, were heard by him.


Kevin S. Nixon for the defendant.
Tracey A. Cusick, Assistant District Attorney, for the
Commonwealth.


HINES, J.  On October 13, 1998, the victim was shot to

death in her home.  A jury convicted the defendant, the victim's

estranged husband, of murder in the first degree on the theories

of deliberate premeditation and extreme atrocity or cruelty, and

armed home invasion.  The defendant appealed from his convictions and from the denial of his two motions for a new trial.  In his brief on appeal, the defendant argues that the trial judge erred in denying his first motion for a new trial on the ground that his trial counsel was constitutionally ineffective in failing to investigate and present a defense of lack of criminal responsibility.  We affirm his convictions as well as the orders denying the motions for a new trial.

Background.  1.  The trial.  Based on the evidence adduced at trial, the jury could have found the following facts.  The defendant and the victim were married in 1989, and their son was born later that year.  A few years later, the couple moved into their family home, located in Quincy.  As time progressed, the marriage became turbulent and tension grew between the couple.  In February, 1998, the victim sought and was granted a restraining order against the defendant, the terms of which required him to vacate the marital home.  For a number of months, the defendant stayed with family or friends and later moved into an apartment in the Dorchester section of Boston.  In September, 1998, the defendant and his then girl friend moved to Richmond, New Hampshire, to live with the defendant's uncle.

On the afternoon of the day of the murder, the defendant began drinking one hundred proof peppermint schnapps and

ingesting Elavil[1], a prescription medication that the defendant had found.  Later that evening, the defendant purchased two twelve packs of beer, and drove to a nearby bridge where he drank the beers, smoked "crack" cocaine, and took more Elavil. Next, the defendant drove to a bar just over the Massachusetts border where he consumed more alcohol until the bartender refused to serve him.  After leaving the bar, he ingested more Elavil and smoked crack cocaine and marijuana, before driving to Quincy.

The defendant arrived the victim's home between approximately 11:30 P.M. and midnight.  He retrieved his golf bag, containing golf clubs and a .22 caliber rifle, from the trunk of his vehicle.  The defendant had purchased the rifle and .22 caliber ammunition a month or so before that night.[2]  Once on the porch, the defendant dropped a can of beer and a straw, and used the golf bag to break the front porch window of the home. He entered and went up the stairs to the master bedroom where he shot the victim with the rifle and beat her with the stock of

---

[1] Elavil is an antidepressant prescription medication, which has sedative effects.

[2] When purchasing the rifle from a department store, the defendant provided several false responses on the Bureau of Alcohol, Tobacco, Firearms, and Explosives form that is required to secure a firearm.  He falsely indicated that he was neither subject to a restraining order nor "under indictment or information in any court" for which he could be imprisoned for more than one year.

the rifle until it broke into pieces. At around 8:30 A.M. the next day, the victim's eight year old son discovered his mother's body in the bedroom.

The victim suffered gunshot wounds to her chest and abdomen, multiple lacerations on her head caused by blunt force trauma, and abrasions on her back. The cause of death was multiple gunshot wounds.

Following the murder, the defendant drove back to his uncle's home. The defendant spoke with his uncle briefly and then got into bed with his girl friend. She noticed that his hands were swollen and had cuts on them. The defendant explained that he had been in a bar fight.

When the defendant and his girl friend awoke on the morning of October 14, they packed an overnight bag for a trip to Massachusetts, where they planned to go to a bank to get money, possibly to leave town. The girl friend drove while the defendant slept in the passenger seat. The two arrived in Braintree at around 5 P.M., after the bank had closed.

After speaking to a longtime friend of the defendant who did not want the pair to come to her house, the girl friend attempted to hide the vehicle, and ultimately discovered that the defendant's golf bag was missing from the trunk. When she asked the defendant if he had killed the victim, he said he was not sure, but that he remembered being on the porch of the

victim's home. After this conversation, the defendant and the girl friend planned to go to Florida, where she had family. The defendant ended up driving to Lawrence, where his cousin lived. Shortly thereafter, the police arrived and arrested the defendant. During a search of the defendant's vehicle, the police found one live round of ammunition; a box of .22 caliber ammunition; live rounds of .22 caliber ammunition in the pouch of a sweatshirt; and full and empty beer cans that matched the brand of beer the defendant had dropped on the porch.

At trial, the defendant testified and presented witnesses in support of his mental impairment (diminished capacity) defense.[3] The defendant and his uncle testified extensively on the defendant's drug and alcohol use, beginning when he was thirteen years of age. In his later teen years, the defendant was committed to the Department of Youth Services (DYS) because of his increasing drug and alcohol use. Even after his release from DYS custody, the defendant consistently used drugs and alcohol until he was twenty-four or twenty-five years old. His

---

[3] Although the mental impairment is often colloquially referred to as "diminished capacity," it is well established that "there is no 'diminished capacity' defense in this Commonwealth." Commonwealth v. Companonio, 445 Mass. 39, 45 n.7 (2005), quoting Commonwealth v. Hardy, 426 Mass. 725, 729 n.5 (1998). However, "[i]n accordance with Commonwealth v. Gould, 380 Mass. 672, 673 (2005), a defendant 'may produce expert testimony on the issue whether or not the impairment of his mental processes precluded him from being able to deliberately premeditate.'" Companonio, supra.

drug use abated for a period of time after meeting and marrying the victim.

The defendant acknowledged that, in February, 1998, he had to vacate the marital home because, following an argument, the victim obtained a restraining order against him. After staying with his parents for a few weeks, the defendant left their home and moved in with friend who lived in New Hampshire. During this time, the defendant used alcohol and drugs, including cocaine, prescription pills, sleeping pills, mushrooms, and marijuana. In March, 1998, after the defendant met and began dating his girl friend, his drug use "got out of control." The defendant's longtime friend testified that because of the restraining order and issues concerning the custody of the defendant's son, the defendant was "upset," "confused," and "stressing out," and began drinking more heavily, partying, and using crack cocaine and other drugs.

A few months after meeting his girl friend, the defendant moved with her into an apartment in Dorchester. While living there, the defendant's job performance began to suffer, and he was referred to the Employee Assistance Program. According to the program counsellor, the defendant appeared depressed, upset, and emotional. Although the defendant admitted that he drank some alcohol during the week, the defendant did not mention his drug use.

The program counsellor referred the defendant to a therapist, Dr. John D. Eckelman, who assisted the defendant in obtaining paid stress leave from work. While on leave, the defendant's drug use increased to the point where he was drinking alcohol and using drugs all day. Although the defendant was receiving his salary while on paid leave, he took out a $20,000 loan against his retirement savings plan, using the money to pay legal bills and rent for the Dorchester apartment, and to purchase drugs.

In August, 1998, the defendant lost visitation rights with his son and sunk deeper into drug and alcohol use. On August 31, 1998, the defendant went to a hospital emergency room, and checked himself in to a detoxification facility known as NORCAP, where he remained for approximately ten days. Shortly after leaving the detoxification facility, however, the defendant returned to his Dorchester apartment and resumed using drugs and alcohol. He missed two appointments with his employee assistance therapist. Although the defendant was supposed to return to work in August, 1998, he failed to do so.

Throughout September, 1998, the defendant continued to use drugs and alcohol in increasing amounts and contemplated suicide. After exhausting his retirement loan funds, the defendant was unable to pay rent and was evicted from his apartment. The defendant and his girl friend moved in with the

defendant's uncle in Richmond, New Hampshire.  There, the defendant continued to use drugs:  crack cocaine, Klonopin, Valium, painkillers, and alcohol.  According to the defendant's uncle, the defendant was "pretty well burned out" and "loaded" in the days leading up to the murder.

Dr. Robert H. Joss, the defendant's retained expert and a forensic psychologist, opined that the defendant's drug and alcohol use on the day of the murder impaired his "ability . . . to carry out planful action" at that time.  Joss added that the level of drugs and alcohol ingested by the defendant that day would have impaired his executive functioning, and would be "consistent with [the defendant] suffering blackouts."

In rebuttal, the Commonwealth called Dr. John D. Eckelman, the therapist to whom the defendant was referred by his employee assistance counsellor.  Eckelman testified that during their sessions, the defendant discussed his marital issues and admitted to feeling "very stressed and pressured" in his relationship with the victim.  Although the defendant admitted to Dr. Eckelman that he drank during the week, the defendant apparently did not mention drug use.  The Commonwealth also called Dr. Malcolm P. Rogers, a forensic psychiatrist with expertise in the effects of drug and alcohol consumption on the central nervous system.  After interviewing the defendant and reviewing relevant records, Dr. Rogers opined that the defendant

"did not have any significant cognitive deficits" on October 13, 1998, and that the defendant had the capacity to form the specific intent kill the victim.

2. <u>First motion for a new trial</u>. In April, 2006, after filing a timely notice of appeal in this court, the defendant filed a motion for a new trial, claiming ineffective assistance of counsel based on trial counsel's failure to "investigate or develop a defense of lack of criminal responsibility stemming from defendant's history of mental illness and from defendant's drug and alcohol intoxication."[4] We remanded the motion to the Superior Court. Following a nonevidentiary hearing, the trial judge denied the defendant's motion without specifically addressing the merits of the ineffective assistance of counsel claim.

<u>Discussion</u>. 1. <u>Standard of review</u>. Where a defendant has been convicted of murder in the first degree, we review his ineffective assistance of counsel claim under G. L. c. 278, § 33E, to determine whether counsel's action, or the failure to act, created a "substantial likelihood of a miscarriage of justice," a standard more favorable to the defendant than the constitutional standard otherwise applied under <u>Commonwealth</u> v.

---

[4] The defendant filed a second motion for a new trial claiming a violation of his Sixth Amendment right to a public trial. He does not press the denial of this second motion for a new trial in this appeal. Nonetheless, we have reviewed the issue pursuant to our duty under G. L. c. 278, § 33E.

Saferian, 366 Mass. 89, 96 (1974). Commonwealth v. Wright, 411 Mass. 678, 681-682 (1992), S.C., 469 Mass. 447 (2014). We focus more broadly on whether there was error, rather than on the "adequacy of counsel's performance." Id. at 682. If there was error, the defendant will meet his burden to establish a "substantial likelihood of a miscarriage" of justice only if the error "was likely to have influenced the jury's conclusion." Commonwealth v. Spray, 467 Mass. 456, 472 (2014), quoting Commonwealth v. Wright, supra. "Where a new trial is sought based on a claim of ineffective assistance of counsel, the burden of proving ineffectiveness rests with the defendant." Commonwealth v. Kolenovic, 471 Mass. 664, 673 (2015), quoting Commonwealth v. Montez, 450 Mass. 736, 755 (2008).

2. Trial counsel's failure to investigate and develop a lack of criminal responsibility defense. a. Failure to investigate. The defendant recounts a litany of claimed lapses in making the case that counsel failed to investigate the possibility that at the time of the murder, the defendant suffered from a mental illness that would support and compel a lack of criminal responsibility defense. In particular, he claims that counsel erred in failing to investigate (1) the defendant's self-reporting of a diagnosis, made some seventeen years earlier, of mental illness (schizophrenia) and "organic brain abnormality"; (2) facts contained in the homicide

investigation reports suggesting that the defendant was mentally ill;[5] (3) a statement from his girl friend that the defendant, on the day after the murder, told her "it had seemed like a bad dream"; (4) the defendant's report to his investigator that he was in a "dreamlike" state; (5) the defendant's statement to the Commonwealth's examining psychiatrist that he remembered being on the porch but he could not recall if it was a dream or reality; (6) the defendant's statement during the competency evaluation that he "hears screaming"; (7) a statement to the on-call employee assistance therapist on August 31, 1998, that he was having "crazy thoughts"; and (8) progress notes from the Norfolk County jail where the defendant was being held pending trial. These lapses, he argues, are of such moment that the judge erred in denying his motion for a new trial. We disagree.

"Failure to investigate an insanity defense [falls] below the level of competence demanded of attorneys, if facts known to, or accessible to, trial counsel raised a reasonable doubt as to the defendant's mental condition." Commonwealth v. Roberio, 428 Mass. 278, 279-280 (1998), S.C., 440 Mass. 245 (2003), quoting Commonwealth v. Doucette, 391 Mass. 443, 458-459 (1984). Thus, a duty to investigate an insanity defense arises when counsel is aware of information suggesting at least the

---

[5] The defendant does not specify, in his brief, the facts upon which this contention is based.

viability of a lack of criminal responsibility defense.
Roberio, supra at 280.  We consider next the information available to trial counsel and whether counsel acted reasonably in response to that information.

The defendant's assertion that he had a history of mental illness that warranted further investigation is not borne out by the record.  What counsel knew from the defendant and others he consulted during his preparation for trial was not of sufficient clarity or certainty to create a "reasonable doubt as to the defendant's mental condition."  Roberio, 428 Mass. at 280.  At best, counsel was aware that the defendant believed that he suffered from a mental illness.  The only evidence of this condition was the defendant's self-reporting and his uncle's claim that he suffered from mental illness and an "organic brain abnormality," both discovered when he was committed to DYS and hospitalized seventeen years earlier.  Even if the evidence had established that the defendant suffered from psychotic episodes or some other mental illness when he was an adolescent, seventeen years prior to the murder, counsel had no basis to assume a connection between his mental condition as a teenager and his mental condition at the time of the murder.  See Commonwealth v. Walker, 443 Mass. 213, 225-226 (2005) (suicide attempt and military discharge occurring thirteen years before

victim's killing insufficient to suggest potential insanity defense).

In the motion for a new trial, the defendant claimed that certain facts discovered during the homicide investigation should have alerted counsel to the need to investigate a lack of criminal responsibility defense. Because the defendant has not informed us of those facts, we cannot determine whether, with knowledge of those facts, counsel would be compelled to consider the defense.

The statements from those persons in close contact with the defendant, both before and after the murder, are scant evidence that the defendant may have lacked criminal responsibility when he killed the victim. These statements do not necessarily signify mental illness. Instead, they may just as easily manifest profound regret that a life has been taken in so brutal a fashion.

Last, the defendant's reliance on progress notes from the health services for the Norfolk County sheriff's office also fails to advance his argument. The progress notes report that the defendant was "quite anxious," had "excessive dwelling on . . . problems," "low energy," "variable sleep," and "racing thoughts on other problems."[6] Similarly, a September, 1998,

---

[6] Intake forms from the defendant's detoxification facility, NORCAP, list a litany of symptoms as an option for "[c]hief

discharge summary from NORCAP noted that the facility's psychiatrists thought the defendant had "dysthymia"[7] and "some mood swings," and prescribed an antidepressant medication. The report also noted, "[m]ini mental normal," "[n]eurological negative." Notably, the discharge summary discharge disposition reflected only follow up with a primary care physician. As we have stated previously, "a decision not to pursue an insanity defense for tactical reasons, for instance because in the circumstances the defense would be factually weak, is not tantamount to ineffective assistance of counsel." Spray, 467 Mass. at 473.

Given the dearth of information suggesting even the possibility of a viable lack of criminal responsibility defense, we discern no basis to conclude that trial counsel was obliged to embark on a futile journey into the realm of an insanity defense. See Commonwealth v. Lang, 473 Mass. 1, 15 (2015) (Hines, J., concurring) (rejecting proposition that defense counsel must "pursue a full scale mental evaluation in every

---

[c]omplaint," including but not limited to hallucinations, delusions, severe agitation, manic behavior, and bizarre behavior, but only "depression," "ETOH dependence," and "drug dependence" were marked for the defendant.

[7] Dysthymia is mild depression or a chronic, more persistent depression that is not of the same severity as a major depression.

case where the facts or the defendant's background suggests only a hint of a mental issue").

Even if counsel was obligated to investigate the defendant's mental history, trial counsel was not culpably derelict in handling the issue of the defendant's mental condition at the time of the murder. Leading up to the trial, the defendant was represented by three different attorneys. Although these attorneys, both retained and appointed, did not do all that the defendant demanded, they took appropriate and necessary steps to investigate the defendant's mental history and the possibility of a lack of criminal responsibility defense. See Commonwealth v. Candelario, 446 Mass. 847, 857-858 (2006). Trial counsel had the benefit of these efforts in preparing the defense offered at trial.

The defendant's first attorney retained Dr. Harold R. Rosenblatt, a specialist in internal medicine and addiction medication at the Spaulding Rehabilitation Hospital, to assess the impact that drugs and alcohol may have had on the defendant's mental state at the time of the murder. Although privately retained, this attorney also filed a motion for funds for electroencephalogram (EEG) and computerized tomography (CT) testing of the defendant's brain functioning. Dr. Rosenblatt did not testify at trial, but the first attorney's pretrial disclosure indicated that Dr. Rosenblatt was prepared to opine

on the effect of drugs and alcohol on the defendant's ability to form a specific intent to kill.

The defendant's second attorney requested and received authorization from the trial court judge to retain a psychiatrist to examine the defendant.[8]  Prior to his withdrawal from the case,[9] this attorney, at the defendant's insistence, also filed a motion for funds to hire a neurologist to evaluate the defendant for his claimed "brain abnormality."  In advocating for the testing, defense counsel explained that although no medical professional recommended the testing, he sought funds because "[the defendant] feels and strongly suspects that he suffers from a brain abnormality, which if [sic] could be explored and shown to be true would then allow a him a full-blown insanity defense."  Noting that the defendant

_____

[8] Although the judge allowed the defendant's motion in the amount of $5,000 in October, 2000, defense counsel represented to the judge that the funds allotted were insufficient to hire a psychiatrist.  This attorney, who was personally selected by the defendant for appointment by the court, withdrew from the case after the defendant represented to the judge that the relationship had broken down over the defense of the case.

[9] The defendant filed an oral motion to "discharge" his attorney due to a "breakdown of [the attorney-client relationship] with regard [the defendant's] defense."  The attorney assisting the defendant's second defense attorney stated that he was in communication with forensic psychologist Dr. Robert Joss and a neuropsychologist to explore the impact that prolonged substance abuse may have had on the defendant's brain, but did not move forward with the process because he was not primary counsel on the case.  After several disruptions by the defendant, the judge granted defense counsel's motion to withdraw.

presented no evidence (medical or otherwise), beyond his own belief, that he suffered from an brain abnormality, the judge denied the motion.

In December, 2000, the judge appointed the third attorney, who eventually tried the case. At counsel's urging, the judge ordered the defendant to undergo EEG testing and a CT scan. Neither test yielded abnormal results. Beyond these tests, trial counsel also took steps to have the defendant evaluated to determine whether he was competent to stand trial. A few days before the defendant's scheduled trial date, trial counsel filed a motion for a competency evaluation pursuant to G. L. c. 123, § 15, and, in "an exercise of extreme caution," the judge granted the motion.

After evaluating the defendant, the director of forensic services at Bridgewater State Hospital determined that the defendant was not suffering from a major mental illness and that he was competent to stand trial. Other tests suggested that the defendant was possibly "exaggerat[ing] or malingering."[10] This doctor noted:

> "In my opinion, [the defendant's] behavioral outbursts, bouts of uncooperativeness with attorneys, insistency that his wife is not dead, and rigidity and

---

[10] Indeed, while awaiting trial in pretrial detention, the defendant told his girl friend during telephone conversations that if he went to Bridgewater State Hospital, it would be "easier," the food would be better, and he would be able to give her a hug.

stubbornness about these issue[s] make him [a] problematic defendant, but not an incompetent one. His difficulties are not born of a mental illness or mental defect, but rather reflect a man who is desperately trying to avoid reality, of which he is well aware."

Following a hearing on competency, the judge found the defendant competent to stand trial.

Considering the totality of the information available to counsel, the record is devoid of evidence that even remotely suggests a more comprehensive investigation would have revealed evidence supporting an insanity defense. See Walker, 443 Mass. at 225-226. Accordingly, trial counsel's decision to forgo further investigation of a lack of criminal responsibility defense based on mental illness was not error.

In his motion for a new trial, the defendant argued that he was prejudiced by counsel's failure to investigate the information that counsel would have discovered if the claimed lapses had not occurred. Rather than showing prejudice, however, this information shows that it would not have made a difference in the viability of a lack of criminal responsibility defense. A July, 1981, DYS psychiatric evaluation noted that the defendant described "recurrent experience of depersonalization" and "paranoid delusions," but also noted that the defendant's "[r]eality testing was intact and there were no indications of thought disorder." Although the evaluation concludes that the defendant was "bordering on psychotic

decompensation" and recommended that he undergo further psychiatric treatment, nothing in the evaluation suggests that the defendant was ever diagnosed with a mental illness. Similarly, absent from the September, 1981, follow up DYS report detailing the defendant's treatment plan is the suggestion that the defendant suffered from a mental illness.

The defendant also points to certain DYS records indicating that he was an inpatient at a hospital in August, 1981.[11] In his affidavit, the defendant asserts that the EEG test administered at the hospital he was sent to by DYS "indicated possible schizophrenia." However, as is clear from Dr. Joss's affidavit, EEG testing will not show schizophrenia. Therefore, the records would have provided little if any insight into whether the defendant suffered from such a mental illness, evidence that could have triggered an obligation to further investigate the issue. See Roberio, 428 Mass. at 279-280.

The defendant's reliance on seventeen year old DYS and related hospital records is not persuasive. At most, the records reflect only a suggestion that the defendant may have suffered from a mental illness as an adolescent. The defendant was thirty-four at the time of the murder. Moreover, the defendant's EEG and CT scans showed no abnormalities. Beyond

_____

[11] Although this hospital confirmed that the defendant was an inpatient, the facility was unable to locate his charts.

indicating that the defendant appeared to exhibit signs of depression and to be upset, tired, and emotional, neither the employee assistance counsellor nor Dr. Eckelman's testimony suggested that the defendant was suffering from a mental illness.

3. Reasonableness of trial counsel's strategic decision. Where the claimed ineffectiveness is the result of a tactical decision of counsel, the defendant will prevail only if he demonstrates that counsel's tactical choice was "manifestly unreasonable" (citation omitted). Kolenovic, 471 Mass. at 674. As a threshold matter, we do not doubt that trial counsel's decision to forgo a lack of criminal responsibility defense in favor of a mental impairment defense was a tactical choice. In January, 2001, trial counsel filed a notice of intent to present an insanity defense. However, at trial, counsel noted, "I deliberately stayed as far away from the issue of insanity as I could" because "I do not know if I have it," and eventually chose to withdraw that defense.

Based on what we have said about the lack of evidentiary support for a lack of criminal responsibility defense, we are persuaded that counsel's strategic decision was not manifestly unreasonable. "[A] decision not to pursue an insanity defense for tactical reasons . . . is not tantamount to ineffective assistance of counsel." Spray, 467 Mass. at 473.

Two principles guide the "manifestly unreasonable" test. First, "we evaluate the [strategic or tactical] decision at the time it was made, and make 'every effort . . . to eliminate the distorting effects of hindsight.'" Commonwealth v. Glover, 459 Mass. 836, 843 (2011), quoting Commonwealth v. Fenton F., 442 Mass. 31, 38 (2004). Second, "[s]ubstantively, [o]nly strategy and tactics which lawyers of ordinary training and skill in criminal law would not consider competent are manifestly unreasonable" (quotations omitted). Kolenovic, 471 Mass. at 674, quoting Commonwealth v. Pillai, 445 Mass. 175, 186-187 (2005).

Although there was little evidence that the defendant suffered from a mental illness at the time of the murder, there was substantial evidence of the defendant's alcohol and drug use. Defense counsel had information from the defendant, a close relative, and close friends regarding his history of drug and alcohol use. Trial counsel also had access to records from the defendant's stay at NORCAP and from the counselling sessions with Dr. Eckelman. Indeed, other than a mental impairment defense based on the defendant's drug and alcohol use, counsel had no other option.

As we have stated, "reasonableness does not demand perfection." Kolenovic, 471 Mass. at 674. Rather, "the manifestly unreasonable test . . . is essentially a search for

rationality in counsel's strategic decisions, taking into account all the circumstances known or that should have been known to counsel in the exercise of his duty to provide effective representation." Id. at 674-675. "The deference we give to defense counsel's strategic judgment in determining whether it was manifestly unreasonable reflects the strong presumption that counsel knows best how to defend a client." Glover, 459 Mass. at 843. Although trial counsel's strategic choice failed to yield a favorable disposition for the defendant, nevertheless, we cannot conclude that it was manifestly unreasonable or inconsistent with what "'lawyers of ordinary training and skill in criminal law' would deem to be competent." Kolenovic, 471 Mass. at 675, quoting Pillai, 445 Mass. at 186-187.

4. Relief pursuant to G. L. c. 278, § 33E. In his appeal, the defendant raises only the ineffective assistance of counsel claim discussed above. Nevertheless, pursuant to our obligations under G. L. c. 278, § 33E, we examine the "whole case for its consideration of the law and the evidence." G. L. c. 278, § 33E. See Commonwealth v. Brown, 376 Mass. 156, 166-167 (1978).

a. Ineffective assistance of counsel in the presentation of the mental impairment defense. Although the defendant did not argue in his motion for a new trial that counsel's

presentation of the mental impairment defense based on drug and alcohol use was inadequate, he asserts the point indirectly in this appeal from the denial of the first motion for new trial. Nonetheless, we consider the issue in our G. L. c. 278, § 33E, review in which the inquiry is whether counsel's performance in presenting the mental impairment defense resulted in a substantial likelihood of a miscarriage of justice.

We conclude that the defendant has failed to demonstrate that better preparation of the mental impairment defense would have produced more persuasive testimony from Dr. Joss or more convincing evidence of mental impairment.  In analyzing defense counsel's presentation of the defense of mental impairment, we "evaluate the conduct from counsel's perspective at the time." Lang, 473 Mass. at 21 (Lenk, J., concurring), quoting Strickland v. Washington, 466 U.S. 668, 689 (1984).

At trial, defense counsel presented the testimony of the defendant's uncle, with whom the defendant lived prior to the murder, and the defendant's longtime friend, both of whom testified to the defendant's extensive and consistent history of drug and alcohol use.  Trial counsel also vigorously cross-examined the defendant's girl friend regarding the defendant's history of drug and alcohol use.  Additionally, the defendant testified at length to his drug and alcohol use both historically and on the day of the victim's killing.

Beyond the defendant's testimony and the testimony of the lay witnesses, trial counsel introduced expert testimony from Dr. Joss, a forensic psychologist experienced in evaluating individuals in the area of criminal responsibility and competency to stand trial. In support of his claim of ineffective assistance of counsel, the defendant points out that defense counsel waited until after trial had begun to contact Dr. Joss and failed to provide him pertinent written records. Further, the defendant notes that Dr. Joss interviewed him a mere four days before Dr. Joss testified. Although we are troubled by trial counsel's unorthodox approach of preparing Dr. Joss for trial at what can unarguably be described as the eleventh hour, ultimately the issue is not what it took to accomplish the task but whether it was accomplished. Notwithstanding trial counsel's ill-advised timing with respect to contacting Dr. Joss, the testimony as to the defendant's mental impairment on the day of the murder was adequate for its purpose.

Dr. Joss opined that, based on the various substances that the defendant ingested, including large quantities of alcohol, prescription medications, crack cocaine, and marijuana, the defendant was "impaired in his ability to plan [and] to carry out planful action" on October 13, 1998. Moreover, Dr. Joss opined that the amount of drugs and alcohol the defendant

ingested on the night of the victim's killing was "consistent with suffering blackouts."  Importantly, Joss explained to the jury the difference between the effect of drugs and alcohol on cognitive function versus motor function, a topic on which the Commonwealth focused in its cross-examination.  Specifically, he explained that a person may be able to maintain motor coordination "reasonably well," yet be deficient in other aspects of cognitive function.  Thus, Dr. Joss opined that although a person's mental state may be impaired, he may still retain the physical coordination to move or travel.

To arrive at his opinion Dr. Joss interviewed the defendant for ninety minutes and examined myriad written materials, including the defendant's thirty-one page narrative of his drug and alcohol abuse throughout his life, Dr. Rogers's two evaluations, records from a "private, live-in school" where the defendant resided for a period of time as an adolescent, and medical records from the defendant's visit to a hospital emergency room visit in August, 1998.  Moreover, the record suggests that even though trial counsel did not ultimately secure Dr. Joss as an expert until midtrial, trial counsel had been in contact with Joss well before the trial commenced.[12]

---

[12] In fact, Dr. Joss was among the specialists with whom the defendant's second set of trial counsel communicated in order to explore the issue whether the defendant suffered from an organic

Given Dr. Joss's testimony as to the defendant's mental state at the time of the victim's killing, along with the extensive lay witness testimony as to the defendant's use of drugs and alcohol, we conclude that trial counsel's preparation and presentation of the mental impairment defense was not inadequate such that it was likely to have influenced the jury's verdict.

b. Closed court room. We have considered the issue raised in the defendant's second motion for a new trial and "conclude that the motion judge properly determined that the defendant had not borne his burden of demonstrating that the court room was closed during any portion of the jury selection, because the defendant offered no evidence indicating that the court room was closed by any specific order or that court officers ever told anyone to leave." Commonwealth v. Drayton, 473 Mass. 23, 31 (2015). Moreover, the defendant failed to object to the alleged court room closure during trial and declined to raise the issue on direct appeal, therefore it is deemed procedurally waived. See Commonwealth v. Penn, 472 Mass. 610, 622 (2015), cert. denied, 136 S. Ct. 1656 (2016), quoting Commonwealth v. LaChance, 469 Mass. 854, 857 (2014), cert. denied, 136 S. Ct. 317 (2015).

---

brain syndrome due to a period of prolonged substance abuse. See note 9, supra.

c.  The trial judge's comments to defense counsel.  We also briefly address the trial judge's interactions with defense counsel in the presence of the jury.  On two occasions the judge made comments during trial that, according to defense counsel, suggested to the jury that the judge had an opinion in the case or negatively characterized defense counsel's behavior.  As we have stated, "a judge need take no vow of silence.  He is there to see that justice is done, or at least to see that the jury have a fair chance to do justice. . . .  The judge ought not let the jury be diverted from the real issue" (citation omitted).  Commonwealth v. Haley, 363 Mass. 513, 519 (1973).  Based on our review of the transcript, we conclude that the trial judge adequately "[trod] the narrow path that lies between meddlesomeness . . . and ineffectiveness" (citation omitted).  Id. at 519.  Throughout the trial, the judge was generally respectful and patient with both parties, reserving most colloquies between the parties and the court for sidebar.  Although the judge may have gently rebuked defense counsel on occasion, we conclude that the comments did not create a substantial likelihood of a miscarriage of justice.  See id. at 521 ("A judge may warn or rebuke counsel in a proper case").  Moreover, in an abundance of caution, the judge twice gave

curative instructions reminding the jury that he was neutral on the issue and had no opinion regarding the facts of the case.[13]

Conclusion. Having reviewed the entire record and the briefs on appeal, we see no reason to reduce the verdict or grant a new trial. Accordingly, we affirm the defendant's convictions and the orders denying his motions for a new trial.

So ordered.

---

[13] The trial judge instructed, "If I have said or done anything to cause you to believe that I have any opinion concerning the facts in this case, you are mistaken because I am totally neutral on this issue. It is your decision, not mine, to determine whether the Commonwealth has met its burden of proof."