MANSFIELD, Justice (concurring in part and dissenting in part).
I respectfully dissent in part. The majority's reading of the record is selective. Based on my review of the entire record, the district court should not be reversed. Rather, its handling of the trial should be applauded as a model of how to deal with a difficult defendant.
Wonetah Einfeldt made some bizarre statements during the trial. But they were always out of the presence of the jury. When the jury was present, Einfeldt's behavior changed. She made occasional, targeted interjections, generally to express her disagreement with unfavorable testimony. In today's impolite world, this hardly sets her apart.
Viewing the trial as a whole, Einfeldt showed a sophisticated understanding of the proceedings. She ultimately worked well with her defense counsel, heeding his undoubtedly sound advice that she not take the stand and instead allow the defense case to be presented through the testimony of her codefendants.
The majority opinion sets the bar too low for when a defendant can hold up a trial by being disruptive or making bizarre remarks. I fear today's decision will make trial management more difficult for our trial judges.
Like the majority, I take the issue of mental illness seriously. But I think their opinion is naive. According to the Iowa Department of Corrections, over half of Iowa prisoners have either a serious mental illness or a chronic mental health diagnosis. See Iowa Dep't of Corr., Mental Health Information Sharing Program 1 (Jan. 2017), http://idph.iowa.gov/Portals/1/Meetings/MeetingFiles/OtherFiles/95/8d8a73aa-da57-475e-b44f-77c91800cbd0.pdf. Mental illness and criminal conduct to some extent go together. Except in exceptional cases when the criteria of Iowa Code section 812.3 have been met, mental illness is not a reason to halt a criminal trial, thereby necessitating a later do-over.
I. The Facts Revisited.
The majority characterizes this case as a "physical altercation between [Einfeldt and her two daughters] and a fourth woman named Mulika Vinson on July 14, 2015." This sanitized description of the case does not do justice to its facts. The evidence of Einfeldt's guilt was quite strong.
The trial evidence showed that this was a deliberate, planned beating of the victim (Vinson). Two bystanders saw what happened and testified at trial. Most importantly, one of those bystanders managed to record part of the beating on his cell phone. The video was replayed at trial. As we know from current events, video evidence can be very powerful. It was powerful here.
A. The Events of July 14, 2015. On July 14, 2015, Einfeldt, accompanied by her daughters Danielle and Beatrice Abang-Ntuen, walked up to the front door of Vinson's home in Perry. Vinson was at home with her five-year-old daughter and her four-year-old son. The impetus for the visit was apparently an ongoing feud between Danielle and Vinson over a male coworker.
Meanwhile, two individuals were putting up siding on a nearby house. They heard the commotion and witnessed much of the altercation. One of them later testified that Einfeldt, Danielle, and Beatrice were coming *786 down the street, "angry and looking for a fight." According to this worker, Einfeldt and her daughters yelled at Vinson to come out of her house, which she did. This same worker testified that Danielle initiated the altercation and Einfeldt and Danielle then grabbed Vinson together and threw her to the ground. He recalled that Einfeldt and Danielle did most of the damage to Vinson, but Beatrice also delivered a few blows.
The other worker likewise testified that he saw the three women walking up to Vinson's house, yelling for Vinson to come out. He saw Vinson standing inside the door, reluctant to come outside, although she eventually did. According to this worker, Vinson kept telling the defendants her children were watching. This worker then saw Einfeldt, Danielle, and Beatrice dragging Vinson by the arms and beating her. He recorded a portion of the altercation on his cell phone before he intervened to stop it. The cell phone video, although only a few seconds long, shows both Einfeldt and Danielle dragging and striking Vinson as she lies helpless on the ground. Beatrice is standing and watching, just a few feet away.
Once the second worker intervened, Einfeldt and her two daughters started to walk away down the street. The worker followed them on foot as he spoke on his cell phone with the Perry police department. Vinson remained on the ground injured.
The police arrived soon afterward. Einfeldt and Danielle were taken into custody. Einfeldt told the police, "I beat her mother____ ass, now book me up." When Einfeldt was advised that paramedics were with Vinson, she said something to the effect that "she's going to need them." Vinson was admitted to a hospital later that evening and treated for her injuries.
B. Trial Begins. On August 5, Einfeldt and both daughters were charged with willful injury causing bodily injury. See Iowa Code § 708.4(2) (2015). The defendants were tried jointly beginning on April 18, 2016.
Einfeldt and Danielle raised justification as a defense, while Beatrice denied participating in the assault. All of them asserted that Vinson had brandished a handgun in a threatening manner when she answered the door. They admitted they didn't see the gun after that.
Vinson denied she had a gun. No one found a gun. The construction workers never saw a gun or heard anyone say anything about a gun. It defies common sense that Vinson would have brandished a gun when answering the door, then walked outside without the gun to subject herself to the mercy of the three angry defendants.
As the trial went on, Einfeldt was disruptive at times. During the prosecutor's opening statement, she made interjections out loud three times. The third time, the court took a recess. Out of the presence of the jury, the court had a colloquy with Einfeldt. During this colloquy, Einfeldt took the opportunity to correct a factual statement the prosecutor had made relating to the admissibility of Vinson's prior convictions. Still, she agreed to keep quiet in the future. She also explained that she has anxiety and if she starts having a panic attack, it usually starts with coughing and she would need to leave. The court advised her to let her attorney know "or raise your hand, and we'll take a recess. ... We do want to accommodate those health issues."
Vinson was the State's first witness to testify. Einfeldt kept silent throughout her testimony. One of the bystander workers testified next. During his cross-examination, Einfeldt said "objection" one time after he gave a harmful answer.
*787 C. The Probable Cause Hearing. The next morning, before the jury was summoned, Einfeldt's counsel advised the court that Einfeldt had told him "she did not remember the events of yesterday" and had discussed "her current mental state" with him. He asked permission to make a record as to Einfeldt's mental condition. The district court agreed.
When questioned by her counsel, Einfeldt said she remembered "some" of the evidence from the previous day and "want[ed] to go forward." But when counsel asked Einfeldt if she thought she would be able to pass notes to him when needed, Einfeldt answered, "No, because I don't want you reading my notes. I don't know if I trust-I mean, I do. I think you're a good person. But I just want to kill you. I don't know you." She acknowledged that the previous day she had been upset because she thought her counsel was passing her notes to other parties. She said she had wanted to stab her counsel with a pen in the neck, although she didn't. Yet she said she thought she would be able to pay attention to the trial and was "in control." She concluded,
I don't want to go [to] the hospital. I don't want to go back. I don't want to go to Oakdale. I just want to finish this, and whatever happens just happens. And I want my kids to be all right, and I just don't know what to do. I don't want to answer any more questions.
Einfeldt interjected one further comment: "I think she's poisoning the water."
At this point, Einfeldt's counsel represented to the court, "I don't believe nor have ever felt threatened by her." Nonetheless, he moved to suspend the proceedings under Iowa Code chapter 812, relating to competency to stand trial.
The State opposed the motion. It urged there had been no showing that Einfeldt did not understand the nature of the charges and their consequences or that she was unable to assist in her defense.
The district court questioned Einfeldt further. Einfeldt claimed she had "a diagnosis of paranoid schizophrenia with manic bipolar, PTSD and ADD, or something like that." She said she had prescriptions but had not taken them for a couple of months for financial reasons.
The district court denied the motion to suspend the trial. It explained,
Based upon my observations, not only during the first two days of this trial, but during previous hearings, it appears to me as if Ms. Einfeldt is capable of assisting Mr. Macro in providing a defense.
I do believe she understands the nature of the charges. Just the explanation of the defenses that she believes she has, suggest to me that conversely she understands the underlying charges.
The court added that the previous day had gone relatively smoothly and reassured Einfeldt that if she needed to take a break, she could do so.
D. The Trial Continues. During the course of that morning's testimony, Einfeldt said, "Liar," once during the testimony of a police officer. She later blurted, "I never said that," when another police officer referred to a statement Einfeldt supposedly made. Later, she said, "Ha ha ha," and slapped the table when that officer claimed the only injury he saw on a photograph of Danielle's face was a mosquito bite.
After the jury had been excused for the morning, defense counsel for Danielle and Beatrice complained that Einfeldt had been putting her head down and pulling out tissues loudly and stuffing them back in the box, "all disruptive behavior." The district court denied their motion for mistrial, *788 although it agreed these events had occurred.
In the afternoon, Einfeldt made three brief audible comments during the testimony of the worker who had taken a video of the altercation. Thereafter, the State rested and the jury was excused again. At this point, Einfeldt became a more active participant.
All three defense counsel argued motions for judgment of acquittal. When they were denied, Einfeldt inquired of the district court, "Can I ask one question off the record? Do you ever grant dismissal? I just want to ask." After the prosecutor later argued for the exclusion of a defense witness, Einfeldt asked, "Why are you guys trying to hide the truth? I can't understand that." When there was a discussion about whether the defendants would testify, Einfeldt stated, "I'm telling everybody [Vinson] drove by my house and tried to shoot us"-a reference to an incident that had been excluded based on a motion in limine ruling. She added, "I [will] tell everything that you guys are trying to hide, all the lies that you're making people tell." Her counsel requested a break, and the jury then returned and two defense witnesses testified without incident.
The day concluded with an offer of proof out of the jury's presence. As her attorney concluded his offer-of-proof examination of one witness, Einfeldt added a suggestion that he ask the witness about having received a controlled substance from Vinson. Later, while the prosecutor was cross-examining this same witness during the offer of proof, Einfeldt inquired, "Why are we redeposing her? What is going on?"
When Einfeldt's counsel requested permission to speak privately with Einfeldt, Einfeldt said she wanted "everything on the record," and "she can't take this." She asked generally, "Why [are] you hiding the truth?" She added that she wanted an African-American lawyer. The district court explained the purpose of the offer of proof to her. Einfeldt countered,
I want to know how come everything that's in front of the jury has to be screened by you, but everything that she [ (the prosecutor) ] put in, all the lies that she told, was not screened by you. I don't get it. We're supposed to have more rights than her.
The court responded that it had explained the offer of proof as best as it could and asked Einfeldt to agree to remain quiet during the remainder of the offer.
The next day was uneventful until the time came to make a record on Einfeldt's decision whether to testify or not. She indicated she wanted to testify and continued to argue about the shooting incident that the district court had excluded. The district court emphasized that Einfeldt would be able to answer the questions asked and nothing more. Einfeldt further commented that "[t]he judge is a good guy" and later added that she wanted a trial before the judge rather than the jury.
The jury returned, and Einfeldt generally behaved well as defense witnesses, including Danielle and Beatrice, testified. Meanwhile, Einfeldt had changed her mind and decided not to testify on the advice of her counsel. A record was made with the court out of the jury's presence.
Closing arguments took place the next day, the final day of trial. Einfeldt said nothing during the prosecutor's initial argument or the arguments of the other defense counsel. She corrected her counsel when he said "Beatrice" instead of "Danielle" during closing argument and clapped at the end of that closing. Otherwise, she was quiet. However, during the prosecutor's rebuttal argument, Einfeldt made three brief interjections. Following the third, the district court advised her that if *789 she did that again, she would have to be removed from the courtroom. At that point, Einfeldt voluntarily got up and left.
The jury returned guilty verdicts against Einfeldt and Danielle. It found Beatrice guilty of the lesser-included offense of assault.
E. Sentencing. A presentence investigation report (PSI) was prepared on Einfeldt. Attached to it were two records from Broadlawns Medical Center relating to Einfeldt. In June 2013, Einfeldt appeared at Broadlawns for a psychiatric evaluation complaining of "feeling stressed out." Einfeldt stated that she had been hospitalized at age seventeen[5] and had had recurring paranoia and "exacerbations of her paranoid symptoms" since then but no other hospitalizations. According to the report, she believed she was "married to the devil" and was "vague about hearing voices." However, she "did not want to discuss past diagnoses."
The Broadlawns report gave her a "provisional" diagnosis of paranoid schizophrenia and noted "hallucinations (questionable)." Einfeldt was prescribed one new medication and told to follow up in a month, but she did not return.
Einfeldt next went for another psychiatric evaluation at Broadlawns in October 2015, after she had been charged in this case. She said she had not returned after the first visit "because upon her leaving she saw a body bag." She complained again of paranoia. Once again, the same medication was prescribed, and Einfeldt was told to follow up in one month which, again, she did not do.
The PSI recommended incarceration of Einfeldt. It further recommended that while incarcerated, she obtain a mental health evaluation and be screened for an assaultive behavior class or anger management.[6]
The PSI also included Einfeldt's version of the offense. There, Einfeldt did not mention any mental health concerns. Instead, she provided-in her own words and handwriting-a statement that deftly accepted a degree of responsibility. She wrote, "I am not justifying my behavior. I take full responsibility for the fight ...." Yet she then repeated her claims that Vinson had a gun and that she (Einfeldt) was acting in self-defense. Still, she concluded, "Self-defense doesn't constitute beating the holy crap out of someone even if they have a gun."
The district court began the sentencing hearing by considering Einfeldt's motion for new trial. That motion had, among other things, reraised the question of competency. Concerning Einfeldt's competency, the court explained it had now considered the PSI and attached medical records in addition to the trial and pretrial proceedings. It stated as follows,
Here's what I note regarding that issue: The trial information in this case was filed on August 5, 2015. There was no application for an 812 exam from that date until trial started on April 20[, 2016]. So I infer from that, and I believe it's a reasonable inference, that up until the time Mr. Macro brought this issue to my attention, there was not a concern about Ms. Einfeldt's legal competency.
During the trial it did appear to me as if Ms. Einfeldt was participating in her defense. She also responded appropriately *790 during the colloquy regarding her decision to not testify.
Without question, Ms. Einfeldt did engage in disruptive behavior during the trial, but that may have been simple disrespect. Or I think in Ms. Einfeldt's case it was probably spontaneous emotional outbursts. But that is different from being legally incompetent.
I did not observe behavior that suggested Ms. Einfeldt did not understand the charge or the proceedings or that she was unable to assist with her own defense.
After denying the motion for new trial, the court proceeded to sentencing. Einfeldt testified she had been diagnosed with different mental diagnoses but did not agree with those diagnoses. She elaborated that she was not seeing a doctor or therapist or taking any medications. She addressed the judge and said, "I do respect you." She added, "I do respect the whole system. I believe in the law." She went through much of her prior life history, including past brushes with the law. She acknowledged that "there's a[n] appeal going to be filed in this case," and said she understood "what reversible error is." She stated, "I do honestly believe the Judge was fair," but "[t]he rules are slanted, and they're in favor of [the] State." She testified that if she were put on probation, she would have a job and a place to live and she would comply with the terms of probation. She made no references to any delusions or impulses or paranoia.
The district court sentenced Einfeldt to an indeterminate term of five years' incarceration. See Iowa Code § 902.9(1)(e ).
II. The District Court Properly Denied Einfeldt's Motion to Terminate the Trial for Purposes of a Competency Hearing.
The fighting issue is whether the district court erred in denying Einfeldt's request to suspend proceedings for a competency hearing during the second day of trial. Had the court done so, this would of course have necessitated a new trial at a later date.
A. The Controlling Law. Iowa Code section 812.3 governs this issue and provides,
If at any stage of a criminal proceeding the defendant or the defendant's attorney ... alleges specific facts showing that the defendant is suffering from a mental disorder which prevents the defendant from appreciating the charge, understanding the proceedings, or assisting effectively in the defense, the court shall suspend further proceedings and determine if probable cause exists to sustain the allegations.
Iowa Code § 812.3(1) (2016). Additionally, if the court finds probable cause to sustain the allegations,
[T]he court shall suspend further criminal proceedings and order the defendant to undergo a psychiatric evaluation to determine whether the defendant is suffering a mental disorder which prevents the defendant from appreciating the charge, understanding the proceedings, or assisting effectively in the defense.
Id. § 812.3(2). The psychiatric evaluation is then followed by a competency hearing. Id . §§ 812.4-.5.
Although Iowa has long had provisions relating to mental incompetency of the accused, this two-step process of a probable cause hearing followed by an evaluation and a competency hearing if necessary dates only to 2004. See 2004 Iowa Acts ch. 1084, § 5 (codified at Iowa Code § 812.3 (2005) ). Here, the district court followed the correct procedure. It suspended the proceedings briefly and temporarily so *791 that Einfeldt's counsel and the court could examine her, and so the parties could provide argument and additional information to the court. Hence, the court conducted the clearly required probable cause hearing. But it denied Einfeldt's request to terminate the trial so she could undergo a psychiatric evaluation and a full-blown competency hearing.
Under our precedent, a competency hearing should be granted when the "record contains information from which a reasonable person would believe a substantial question of the defendant's competency exists." Jones v. State , 479 N.W.2d 265, 270 (Iowa 1991) (quoting State v. Kempf , 282 N.W.2d 704, 706 (Iowa 1979) ). We consider three factors: "(1) the defendant's irrational behavior, (2) any demeanor at the trial that suggests a competency problem, and (3) any prior medical opinion on the defendant's competency to stand trial." State v. Edwards , 507 N.W.2d 393, 395 (Iowa 1993).
These factors illuminate for us the ultimate question of competency facing the judge: whether the defendant is prevented from "appreciating the charge, understanding the proceedings, or assisting effectively in the defense." Iowa Code § 812.3(1) (2016); see also State v. Johnson , 784 N.W.2d 192, 194 (Iowa 2010). Mental illness alone is not sufficient to establish incompetency. See State v. Rieflin , 558 N.W.2d 149, 152-53 (Iowa 1996), overruled on other grounds by State v. Lyman , 776 N.W.2d 865, 873 (Iowa 2010). Furthermore, we presume that the defendant is competent to stand trial. Lyman , 776 N.W.2d at 874overruled on other grounds by Alcala v. Marriott Int'l, Inc. , 880 N.W.2d 699, 708 & n.3 (Iowa 2016).
B. Applying the Law Here. Applying each of these tests and standards, I agree with the district court that probable cause did not exist to stop the trial and order Einfeldt to undergo a psychiatric evaluation and a competency hearing. There is no question that Einfeldt understood she had been charged with assaulting and injuring Vinson on July 14, 2015. She recognized she had been offered before trial the opportunity to plead to two aggravated misdemeanors but without the chance to argue for a deferred judgment. She declined this offer. She also understood justification was her primary defense. She was able to explain this defense to the district court during the probable cause hearing.
Einfeldt's comprehension of the proceedings is vividly illustrated by her own statements, both in and out of the presence of the jury. Typically, Einfeldt's interjections in front of the jury were brief comments disputing testimony or statements that she recognized were harmful to that defense. For example: "Lie," "No they didn't," "Liar," "Ha ha ha," "I never said that," "Ha." Sadly, these kinds of courtroom disruptions are not all that uncommon and aren't limited to litigants suffering from mental illness. See United States v. Clements , 522 F.3d 790, 796 (7th Cir. 2008) ("Clements's behavior at trial does not suggest incompetence; it was merely Clements's attempts to interject his own view of the issues and generally frustrate the progress of the trial.").[7]
Outside the jury's presence, Einfeldt took the opportunity to debate legal points with the court. She questioned why her *792 evidence had to undergo an offer-of-proof screening process, when the State's did not. She threatened to circumvent the court's ruling excluding certain evidence by taking the stand. When the State decided to cross-examine a witness during the defendants' offer of proof, she asked, "Why are we redeposing her?" At one point she told the court, "We're supposed to have more rights than [the prosecutor]." These comments demonstrate Einfeldt's savvy, not an inability to understand the proceedings. See id. ("While Clements was at times disruptive, his objections, questions, and suggestions were generally pertinent to the issues being addressed, indicating that Clements was fully attentive to the proceedings and readily offered suggestions and opinions about the evidence and his defense.").
The record also indicates that Einfeldt was able to assist effectively in her defense. Despite the distrust she claimed to have for her attorney at the beginning of the second day of trial, she communicated effectively with him about her case through the rest of the proceedings. She did not hesitate to direct him toward facts she believed were helpful to her. She generally consulted off the record with him when he asked. Despite her ebullience she ultimately accepted his recommendation not to testify. She applauded when he completed his closing argument on her behalf.
Einfeldt apparently suffers from certain mental health conditions, and she testified that she had some disturbing impulses. But apart from making audible editorial comments, and a few theatrical gestures, she generally controlled those impulses in front of the jury until she walked out just a few minutes before the prosecutor finished her rebuttal closing argument. It is true she made some bizarre statements, but never in the presence of the jury . And Einfeldt's counsel made clear that he never felt threatened by her.
Here we have the benefit of the trial court's observations of Einfeldt's demeanor. See Johnson , 784 N.W.2d at 195. It concluded that Einfeldt was actively engaged with her counsel in the defense of her case. Nothing in the record contradicts that.
This does not mean that Einfeldt's outbursts helped her cause. Defendants are often their own worst enemy. Yet disruptive statements by a defendant need to be distinguished from those matters that ultimately tip the scales under Iowa Code section 812.3. Those matters are whether the defendant understands the charges and the proceedings and can effectively assist her counsel. A defendant who engages in rude or even offensive behavior in front of the jury may still be able to effectively assist counsel. Many cases have so found. See United States v. Perkins , 787 F.3d 1329, 1339-40 (11th Cir. 2015) (holding that the district court did not abuse its discretion in not ordering a competency hearing before trial because the defendant chose to "act like a ... lunatic" during the trial but appeared lucid in other interactions (alteration omitted) ); Paul v. United States , 534 F.3d 832, 845 (8th Cir. 2008) (finding the defendant had not shown the district court would have found him incompetent, despite the fact that his obstreperous behavior during trial was "unwise and detrimental to him and his cause"); Clements , 522 F.3d at 796 (finding the district court did not err in not sua sponte ordering a competency hearing, despite the defendant's disruptive interjections throughout trial, because "his objections, questions, and suggestions were generally pertinent to the issues being addressed, indicating that [the defendant] was fully attentive to the proceedings and readily offered suggestions and *793 opinions about the evidence and his defense"); United States v. Rivers , No. 95-1364, 1996 WL 167748, at *1 (2d Cir. Apr. 10, 1996) (holding that the district court did not err in not ordering a hearing into the defendant's competency to stand trial, even though the defendant's behavior at trial was "at times unruly," because his interjected "remarks were generally directly responsive to what was being discussed"); Foster v. Wainwright , 686 F.2d 1382, 1383-86 (11th Cir. 1982) (per curiam) ("reject[ing] as meritless" the defendant's claim that the trial court erred in not ordering a hearing on his competency to stand trial, even though the defendant frequently interrupted the proceedings, to the point that the judge justifiably removed him from the courtroom); State v. Woods , 301 Kan. 852, 348 P.3d 583, 592-93 (2015) (holding that district court did not abuse its discretion in not ordering a reevaluation of competency because the defendant exhibited disruptive behavior that was unrelated to what was occurring in trial but was "isolated and could easily be attributed to an attempt to derail the judicial process"); State v. McCoy , 218 So.3d 535, 617-20 (La. 2016) (finding a second sanity commission was not justified, even when the defendant was disruptive during trial, in part because he "exercised self-control when he wanted to"); Commonwealth v. Holland , 476 Mass. 801, 73 N.E.3d 276, 286 (2017) (affirming a determination of competency when at the competency hearing the doctor noted that the defendant's "outbursts [and] bouts of uncooperativeness with attorneys ... make him a problematic defendant, but not an incompetent one" (alteration omitted) ); Hutto v. State , 227 So.3d 963, 976 (Miss. 2017) (finding that after a pretrial hearing had determined competency, a subsequent midtrial outburst did not change the determination because the defendant was not "incoherent and deluded during trial; rather, ... [the defendant] actively participated in the proceedings and engaged in discussions with his counsel"); State v. Ramirez , No. S-1-SC-34576, 2016 WL 7029226, at *4-5 (N.M. Dec. 1, 2016) (finding there was no basis for a reevaluation of competency, even though defendant "was labile, crying, interrupting, and making statements contrary to his interests during trial").
The additional information made available at the time of sentencing did not alter the district court's view of the matter, and does not alter mine. According to a medical record attached to the PSI, Einfeldt received a "provisional" diagnosis of paranoid schizophrenia and "hallucinations (questionable)" in 2013. Yet she did not return for another consultation until she had been criminally charged, more than two years later. Then she didn't return again.
Einfeldt's conduct during sentencing does not suggest incompetence. Rather, Einfeldt testified and allocuted at some length on her own behalf. Einfeldt's statements-and the letter she wrote to the judge beforehand-amounted to a detailed recital of extenuating circumstances and a plea for clemency. She artfully complimented the trial judge on his fairness. In her only reference to mental health conditions, she minimized them. She made no odd statements whatsoever.
I accept as unresolved the actual status of Einfeldt's mental illness. The PSI appropriately recommended a formal diagnostic assessment of the "validity and severity" of Einfeldt's mental health issues if she were sentenced to prison. However, for present purposes, the question is whether the record establishes probable cause to believe that Einfeldt was prevented from appreciating the charge, understanding the proceedings, or assisting in her defense. See Iowa Code § 812.3(1), (2).
*794 The record did not show any of these things.
Cases finding incompetency or probable cause for incompetency correctly focus on the effects of mental illness, rather than the mere presence of mental illness. See, e.g., Maxwell v. Roe , 606 F.3d 561, 569-70, 576 (9th Cir. 2010) (noting the defendant requested his attorney turn over evidence that would be helpful to the prosecution, refused to attend or even listen to the trial proceedings, and tried to kill himself during trial); United States v. Ghane , 490 F.3d 1036, 1040-41 (8th Cir. 2007) (affirming a finding of incompetency to stand trial on a "clear error" standard of review given the defendant's belief that the charges against him were part of a "wide ranging government conspiracy related to events that occurred in the early 1990s" and the defendant's insistence on calling irrelevant witnesses); United States v. Friedman , 366 F.3d 975, 981 (9th Cir. 2004) (affirming a finding of incompetency to stand trial because the defendant's "paranoid schizophrenia [was] preventing him from working with his attorney"); Lafferty v. Cook , 949 F.2d 1546, 1549, 1555 (10th Cir. 1991) (noting the defendant refused to let his attorney present evidence and "suffered from paranoid delusions which drove his decision in these proceedings"); United States v. Hemsi , 901 F.2d 293, 294, 296 (2d Cir. 1990) (affirming a finding of incompetency to stand trial where expert testimony indicated that defendant could maintain his composure "only on rare, non-threatening occasions" and his own attorney, even while opposing a finding of incompetence, "disclaimed any view that [the defendant] could make any rational decisions regarding the defense"); Nagi v. People , 389 P.3d 875, 877, 879 (Colo. 2017) (affirming the trial judge had a "good faith basis" to hold a competency hearing in light of defendant's questionable decision to represent himself in a case involving potential life sentence plus "wild accusations" and other "aberrant behavior").
I am convinced the district court gave the competency question the serious attention it deserved and made an appropriate ruling that applied the correct law to the facts. Given my agreement with the majority's resolution of the evidentiary issues, I would affirm Einfeldt's conviction and sentence.
Waterman and Zager, JJ., join this concurrence in part and dissent in part.

Einfeldt was forty-one years old at the time of this evaluation.

According to the PSI, Einfeldt admitted attempting suicide as a teenager, over twenty years before. Einfeldt denied this at the sentencing hearing and denied any suicidal ideations or attempts.

Other interjections just showed that she was paying careful attention. When counsel for one of the codefendants started cross-examining a witness who had the same last name as this counsel, Einfeldt piped up, "No relation." Also, as noted earlier, Einfeldt corrected her defense counsel when he inadvertently referred to the wrong daughter in closing argument.