NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10776

COMMONWEALTH  vs.  PHILLIP AYALA.


Hampden.     September 12, 2018. - December 6, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Budd, & Kafker, JJ.


Homicide.  Evidence, Identification, Ballistician's certificate,
     Medical record.  Identification.  Mental Health.  Practice,
     Criminal, Disclosure of evidence in possession of Federal
     authorities, Assistance of counsel, Capital case,
     Instructions to jury.  Due Process, Disclosure of evidence.



     Indictments found and returned in the Superior Court
Department on July 10, 2007.

     The cases were tried before Peter A. Velis, J., and a
motion for a new trial, filed on February 10, 2011, was heard by
C. Jeffrey Kinder, J.


     Myles D. Jacobson & Michael J. Fellows for the defendant.
     David L. Sheppard-Brick, Assistant District Attorney, for
the Commonwealth.


     KAFKER, J.  A jury convicted the defendant, Phillip Ayala,

of murder in the first degree on the theory of deliberate

premeditation for the killing of Clive Ramkissoon.[1]  The
defendant raises three core issues on appeal.  First, he argues
that the evidence at trial was insufficient to support his
convictions.  Second, he argues that his due process rights
under the United States Constitution and the Massachusetts
Declaration of Rights were violated by (i) the Commonwealth's
failure to obtain and turn over discovery related to the sole
defense witness's status as a confidential Federal informant,
and (ii) the trial judge's decisions declining to compel several
law enforcement officers to testify to the defense witness's
status as a confidential Federal informant.  Third, he argues
that his trial counsel was ineffective for (i) failing to retain
and call an expert witness on the accuracy of eyewitness
identifications, (ii) failing to retain and call an expert
witness on ballistics evidence to testify about muzzle flashes,
and (iii) failing to admit further evidence of the mental health
issues and drug use of a percipient witness for the
Commonwealth.

    For the reasons stated below, we conclude that there has
been no reversible error.  After a thorough review of the
record, we also find no reason to exercise our authority under

---

[1] The jury also convicted the defendant of the related
charges of unlawful possession of a firearm without a license
and unlawful possession of ammunition without a firearm
identification card.

G. L. c. 278, § 33E, to grant a new trial or to reduce or set aside the verdict of murder in the first degree. We therefore affirm the defendant's convictions and the denial of the defendant's motion for a new trial.

Background. We summarize the facts that the jury could have found, reserving certain details for discussion of the legal issues.

In the early morning of June 10, 2007, Robert Perez and his friend, Clive Ramkissoon, attended a house party held on the second floor of a house in Springfield. Upon arriving just before 2 A.M., Perez and Ramkissoon encountered a bouncer on the first floor at the bottom of the stairwell that led to the second floor. The first-floor bouncer was posted there to search guests before letting them upstairs to the party. After being searched, the two men went upstairs to the party. As there were not yet many people at the party, Perez returned to the first floor and began speaking with the first-floor bouncer in the entryway of the stairwell.

Shortly thereafter, as Perez was speaking with the first-floor bouncer, the defendant arrived at the party. As she had done with Perez and Ramkissoon, the bouncer attempted to pat frisk the defendant before allowing him to enter. The defendant refused. After a brief argument related to the search, the defendant aggressively pushed past the bouncer and climbed the

stairs to the second floor.  A second bouncer intercepted the defendant on the stairs and prevented him from entering the party without having first been pat frisked.  The defendant argued with the bouncer and, after yelling and screaming at him, was escorted out of the house.  As the defendant was descending the staircase to leave, and just steps away from Perez, the defendant threatened to "come back" and "light th[e] place up."[2] After leaving the house briefly, the defendant returned and kicked in the first-floor door.[3]

Throughout this interaction inside the house, Perez had an opportunity to observe the defendant closely for several minutes.[4]  Concerned by the defendant's threats and behavior, Perez returned upstairs to find Ramkissoon.  The two men walked onto the second-floor porch to "assess the situation" and saw the defendant pacing back and forth on the street in front of the house.  Rather than leave with the defendant still outside, given his recent threat to "light th[e] place up," Perez and

---

[2] At trial, a witness who had attended the party testified that the defendant was upset because he felt that hosting a party at the house was disrespectful to his niece, who had recently been killed at a nearby location.

[3] The door was kicked in with such force that police were later able to take a footprint impression from the door and confirm that it matched the defendant's shoe.

[4] Robert Perez's account of the defendant's actions was substantially corroborated at trial by the testimony of the first-floor bouncer.

Ramkissoon decided to wait on the porch for a few minutes. After the defendant moved out of sight, Perez, Ramkissoon, and a female friend decided to leave the party.

After leaving the house, Ramkissoon and the woman began walking across the road, while Perez, who had stopped to tie his shoe, trailed slightly behind. As they were crossing the road, the woman stopped in the middle of the road directly in front of the house and began dancing. Perez walked over to where the woman was dancing while Ramkissoon kept moving down the road, to the left of the house, toward the area where his vehicle was parked. As Perez approached the woman to guide her out of the way of oncoming traffic, he heard a gunshot and saw a muzzle flash appear near a street light located on the sidewalk in front of a property adjacent to the house.[5] Perez saw the defendant holding a firearm and testified that he was able to identify the shooter as the defendant because the muzzle flash from the gun illuminated the shooter's face. He then turned and ran away from the shooting as several more gunshots rang out. Perez, who had previously served in the United States Army, testified that he heard between five and seven shots, which he

---

[5] Perez testified that he saw the muzzle flash came from "the sidewalk area under the light," but later noted that he could not be certain whether the street light was on at the time of the shooting.

recognized as .22 caliber bullets based on his military experience.

Perez soon circled back to where Ramkissoon's vehicle was parked and discovered Ramkissoon face down on the street. Perez performed rescue breathing on Ramkissoon and telephoned the police. Police officers arrived at the scene by approximately 3 A.M. It was later determined that Ramkissoon died from multiple gunshot wounds.[6] Perez was soon brought to the Springfield police station, where he gave a statement recounting the events of that morning. At the station, Perez identified the defendant from a set of photographs shown to him by police, stating that he recognized the defendant's photograph as the "same person who [he] had seen in the stairwell not wanting to be pat frisked by the bouncer there, and then firing the gun outside in the street at [the victim]."

The reliability of Perez's identification was vigorously challenged by defense counsel on cross-examination. The defense confronted Perez on his ability to accurately identify the

---

[6] The police recovered five spent shell casings from the scene of the shooting. The medical examiner also recovered two spent projectiles from Ramkissoon's body. At trial, a police officer with special knowledge of ballistics testified that he performed a microscopic examination of the shell casings and the spent projectiles. Based on the examination, he concluded that all five casings came from a .22 caliber gun. He further concluded that both projectiles extracted from Ramkissoon's body came from the same weapon. The police never located the gun that was used to kill Ramkissoon.

shooter under the lighting conditions at the time of the shooting, his recollection of certain events that morning, and the discrepancies between Perez's statement to police on the morning of the shooting and his trial testimony regarding the defendant's height and clothing. Additionally, the defense presented evidence showing that Perez suffered from bipolar disorder and posttraumatic stress disorder (PTSD), the latter being a result of his military service.[7] Specifically, evidence showed that he sought psychiatric counselling and used marijuana to cope with the effects of his diagnoses.[8] There was no evidence, however, that Perez was either suffering the effects of these diagnoses or under the influence of marijuana at the time of the shooting.

Following the close of the Commonwealth's case-in-chief, the defense called a sole witness, N.F.,[9] who was the disc jockey at the party. N.F. testified that she knew the defendant and looked up to him, and had seen him multiple times that morning.

---

[7] The trial judge ordered Perez to undergo a competency examination by an independent doctor to determine whether these diagnoses would have an impact on his ability to testify. Following the examination, Perez was declared competent to testify.

[8] We discuss the importance of Perez's mental health struggles and drug use to this case in more detail, infra.

[9] Because the records concerning the witness's identity are subject to an order of impoundment, we use the pseudonym "N.F." to refer to her.

N.F. also testified that at one point, she was on the second-floor porch and saw the defendant emotional and upset outside after he had been kicked out of the house.  She and others attempted to comfort the defendant and suggested that he go home.  She testified to then witnessing the defendant leave the party and drive away.  N.F. was adamant that the defendant left approximately thirty to forty-five minutes before the shooting, stating that he was "gone a long time before [the shooting] even went down."  In response to further questioning on her certainty that the defendant was not at the scene at the time of the shooting, she testified, "He was not there.  Put my kids on it." Although she did not witness the shooting, she testified that she observed a red Taurus motor vehicle "skidding off" from the scene immediately after the shooting.

The jury eventually returned guilty verdicts on all three charges, and the defendant was subsequently sentenced to life in prison without the possibility of parole.  The defendant now appeals.

Discussion.  1. Sufficiency of the evidence.  On appeal, the defendant argues that the Commonwealth failed to present sufficient evidence proving that he was the shooter.  In reviewing the sufficiency of the evidence, we apply the familiar Latimore standard.  See Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979).  We consider whether, after viewing the evidence

in the light most favorable to the Commonwealth, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.  Id.  The evidence may be direct or circumstantial, and we draw all reasonable inferences in favor of the Commonwealth.  Commonwealth v. Rakes, 478 Mass. 22, 32 (2017).  A conviction cannot stand, however, if it is based entirely on conjecture or speculation.  Id.

At trial, the Commonwealth primarily relied on the eyewitness testimony of Perez to prove that the defendant was the shooter.  The defendant argues, however, that this testimony cannot be used to support his convictions because the jury were incapable of assessing its reliability.  The defendant's challenge centers on Perez's testimony that he was able to identify the defendant as the shooter because the muzzle flash from the gun "illuminated" the defendant's face.  The defendant argues that because the illuminating capability of a muzzle flash is not within the ordinary, common experience of a reasonable juror, the jury could not have found that the evidence proved beyond a reasonable doubt, without speculation, that the defendant was the shooter.

Even assuming, as the defendant argues, that ordinary jurors are unfamiliar with the illuminating capability of muzzle flashes, there was independent evidence that would permit a rational juror to reasonably infer that the crime scene was

sufficiently illuminated at the time of the shooting to provide Perez with the opportunity to identify the defendant as the shooter.

Evidence at trial established that the shooting took place near a street light located on the sidewalk in front of the property adjacent to the house.[10] A police officer testified that the street lights near the location of the shooting and the exterior lights on a nearby building were illuminated when he arrived at the crime scene at approximately 4:30 A.M.[11] Although there was no evidence whether the specific street light near where the shooter was standing was on at the time of the shooting, a juror could reasonably have inferred that if the street lights in the area were on at 4:30 A.M., they would have also been on at the time of the shooting earlier in the morning.[12] Even if an ordinary, rational juror is unfamiliar

---

[10] The police recovered five spent shell casings from the scene of the shooting. Each casing was located near the street light in front of the property adjacent to the house that Perez identified as the light under which the shooter was standing. The shell casings were located to the right of the street light. A police officer testified that, generally, shell casings discharged from a handgun eject to the right of the gun, indicating that the shooter was standing even closer to the street light than where the shell casings landed.

[11] The officer further testified that on arriving at the scene, he observed that "[t]he street was illuminated."

[12] This inference is further supported by the fact that Perez recognized the defendant while he was outside on the

with muzzle flashes, they are undoubtedly familiar with the illuminating capability of street lights.  This common knowledge would have allowed a rational juror to conclude that Perez had an adequate opportunity to identify the defendant as the shooter.  Cf. Commonwealth v. Stewart, 450 Mass. 25, 28, 33 (2007) (evidence sufficient to prove defendant was shooter based, in part, on eyewitness seeing defendant shoot while standing in front of street light).

In addition to the presence of the street light, the jury received other evidence that would have allowed them to assess the reliability of Perez's identification.  For example, the jury heard testimony that Perez had observed the defendant for several minutes earlier in the morning while he was in the stairwell.  They also heard testimony that Perez recognized the defendant walking on the street from the second-floor porch after the defendant was kicked out of the party.  Additionally, evidence showed that Perez successfully identified the defendant from a photographic array at the police station after the shooting.  This evidence would further have provided a rational juror with an adequate basis to assess the reliability of Perez's identification of the defendant at the time of the shooting.  Cf. Commonwealth v. Richardson, 469 Mass. 248, 249-

---

street and Perez was on the second-floor porch earlier in the morning.

251 & n.3, 255 (2014) (evidence sufficient where eyewitness identified defendant fleeing from police from over 200 feet away, selected defendant's photograph from photographic array at police station, and had seen defendant on two prior occasions).

The Commonwealth also presented circumstantial evidence linking the defendant to the shooting. For example, prior to the shooting, the defendant arrived at the party and refused to be searched. He was visibly upset that there was a party taking place at the house, and after being kicked out, he threatened to come back to the party and "light th[e] place up." Soon after, he returned and kicked in the first-floor door with such force that he left a footprint on the door. Additionally, the defendant was seen pacing around on the street in front of the house just a few minutes before Perez and Ramkissoon left the party and the shooting took place. From this evidence, the jury could have reasonably inferred that the defendant did not want to be searched on the morning of June 10 because he was carrying a gun, that he was still near the house when the shooting occurred, and that his anger about the party motivated him to shoot Ramkissoon as he crossed the street. This evidence, when taken together, "formed a mosaic of evidence such that the jury could conclude, beyond a reasonable doubt, that the defendant was the shooter" (quotation and citation omitted). Commonwealth v. Jones, 477 Mass. 307, 317 (2017). Cf. id. at 316-318

(sufficient evidence that defendant was shooter where evidence linking him to shooting was that he generally matched description of person seen fleeing crime scene, he was at park where crime occurred that day, he grew up in area and regularly visited park, and he lied to police about his whereabouts that day).

We therefore conclude that the evidence, when viewed in the light most favorable to the Commonwealth and taken together with the reasonable inferences drawn therefrom, was sufficient to support the jury's verdict that defendant was the one who shot and killed the victim.  See Latimore, 378 Mass. at 677-678.

2.  Dual sovereignty.  The defendant also argues that his due process rights under the Fifth and Sixth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights were violated by (i) the Commonwealth's failure to obtain and turn over discovery related to the sole defense witness's status as a confidential informant, and (ii) the judge's decisions declining to compel various State and Federal law enforcement officers to testify to the defense witness's status as a confidential informant.  Because we conclude that the informant records and sought-after testimony were not in the possession or control of the Commonwealth and that the Commonwealth did not have the burden to secure the Federal government's cooperation with regard to the disclosure

of this information, the judge did not abuse his discretion in denying and quashing the defendant's various motions and subpoenas.

a. Relevant facts. Shortly before the trial was originally scheduled to begin in July 2008, the Commonwealth informed defense counsel that it had recently learned that a witness likely to be called by the defense, N.F., was a confidential informant for a Federal gang task force operating in Springfield.[13] As a result of this new information, the trial was continued several times until over one year later in August 2009.

The Commonwealth's disclosure resulted in multiple motions by the defendant to obtain Federal records detailing N.F.'s status as a confidential informant (informant records) and to compel the testimony of Federal agents regarding the same through State court proceedings.[14] The defendant argued that the

_____

[13] The task force included several State police officers who were deputized as "Special Federal Officers" for the purposes of participating in the task force.

[14] The defendant filed a motion for the production of exculpatory evidence related to N.F.'s status as an informant. The Commonwealth opposed the motion, arguing that it did not have possession or control of the requested information. The motion judge agreed with the Commonwealth and denied the defendant's motion to the extent that it requested that the Commonwealth produce records that were not in the Commonwealth's possession or control. The motion judge further suggested that the defendant attempt to subpoena the Federal authorities for that purpose.

information was material to his defense because it was necessary to demonstrate N.F.'s credibility as a witness, which the defendant contended was exculpatory information. At various times, the defendant was informed that a successful pursuit of this information would require that he comply with the procedure set forth by Federal regulations. The federally mandated procedure required the defendant to submit a written request for information describing the informant records and the subject matter of the testimony sought. Federal authorities would then review the sought-after information for privilege, confidentiality, and the likelihood that its disclosure would compromise ongoing investigations. After this review, the Federal authorities would report back to the defendant and either disclose the requested information or explain why it was continuing to be withheld. Despite being made aware of the Federal procedure, the defendant refused to comply and continued

---

The defendant next filed a motion to examine N.F.'s records pursuant to Mass. R. Crim. P. 17 (a) (2), 378 Mass. 885 (1979). The motion judge allowed the defendant's motion under rule 17, and summonses to various Federal agencies were issued. The Federal government then filed a motion to quash the summonses sent to Federal authorities. The motion judge allowed the motion to quash, concluding that the defendant was instead required to follow the established Federal regulations to obtain records from a Federal agency. The defendant eventually petitioned for relief to a single justice of this court, which was denied. The defendant's subsequent appeal to the full court was also denied. Ayala v. Commonwealth, 454 Mass. 1015, 1015 (2009).

to unsuccessfully request that the trial court judge compel Federal authorities to disclose this information.

During the time period of the continuance, and while engaging in the pursuit of the federally held information, the defense had the opportunity to depose N.F.  At her deposition, N.F. testified to her status as a confidential informant for the Federal Bureau of Investigation (FBI), including the nature of her work and compensation.  She also testified to her observations on the morning of the shooting, which supported the defendant's theory that he was not present at the scene at the time of the shooting.  Specifically, N.F. testified that she witnessed the defendant driving away from the scene before the shooting took place, and instead implicated another individual whom she witnessed fleeing the scene.  The deposition also revealed that N.F. had telephoned a Federal agent on or about the morning of the shooting and described what had occurred.

On the eve of trial, the defendant filed a motion to dismiss the case based on the Commonwealth's failure to turn over N.F.'s informant records.  The motion was eventually denied.  The defendant then sought once again to compel the testimony of a member of the Federal gang task force, but the subpoena was quashed.  Subpoenas for several other law enforcement officers and an assistant United States attorney were similarly quashed.  After these subpoenas had been quashed

and the trial was set to begin, at the suggestion of the trial judge, the defendant finally submitted a request to Federal authorities for the informant records in compliance with the governing Federal regulations described above. Redacted copies of these records were disclosed to the defendant a few days later, before the defense had rested its case. These records effectively confirmed N.F's status as a confidential Federal informant and included a summary of a statement made by N.F. to a Federal law enforcement officer regarding the shooting. The Federal government also authorized two law enforcement officers to testify on a limited basis.

b. Analysis. The due process clauses of the Federal Constitution and the Massachusetts Declaration of Rights require that the Commonwealth disclose material, exculpatory evidence to the defendant.[15] Committee for Pub. Counsel Servs. v. Attorney Gen., 480 Mass. 700, 731 (2018). See Brady v. Maryland, 373 U.S. 83, 87 (1963); Commonwealth v. Donahue, 396 Mass. 590, 596

---

[15] For the purposes of our analysis, we assume, without in any way deciding, that the information that would confirm N.F.'s status as an informant falls within the scope of what is considered exculpatory information. See Commonwealth v. Williams, 455 Mass. 706, 714 n.6 (2010) ("[E]xculpatory is not a technical term meaning alibi or other complete proof of innocence, but simply imports evidence which tends to negate the guilt of the accused . . . or, stated affirmatively, supporting the innocence of the defendant" [quotations omitted]); Commonwealth v. Pisa, 372 Mass. 590, 595 (1977), cert. denied, 434 U.S. 869 (1977).

(1986).  This obligation, however, is "limited to that [information] in the possession of the prosecutor or police" (citation omitted).  Donahue, supra ("The prosecutor cannot be said to suppress that which is not in his possession or subject to his control").

The information related to N.F.'s status as a confidential informant was not in the Commonwealth's possession or control, but rather was in the possession and control of the Federal government.  There is no contention, nor is there any evidence, that any member of the Federal government or the Federal gang task force assisted in the investigation or prosecution of the defendant's case.  The records held by the task force therefore cannot be said to have been in the possession or control of the Commonwealth.  See Commonwealth v. Beal, 429 Mass. 530, 532 (1999).  The Commonwealth was therefore under no obligation to turn over this information.  See id. ("The prosecutor's duty does not extend beyond information held by agents of the prosecution team"); Donahue, 396 Mass. at 596-597.

Although we do not charge the Commonwealth with the obligation to disclose exculpatory information that it does not possess or control, we have recognized that issues of Federal and State sovereignty have the potential to prejudice a defendant being prosecuted in State court by stymying his or her ability to obtain exculpatory information held by Federal

authorities.  Donahue, 396 Mass. at 598.  See Commonwealth v. Liebman, 379 Mass. 671, 674 (1980), S.C., 388 Mass. 483 (1983). Accordingly, under certain circumstances we will require the Commonwealth to bear the burden of securing the cooperation of the Federal government with regard to the disclosure of exculpatory information.  Donahue, supra.  See Commonwealth v. Lykus, 451 Mass. 310, 327 (2008); Liebman, supra at 675. Imposing this burden serves to guard against any potential unfairness to a defendant that may arise due to the presence of two sovereigns.  See Lykus, supra at 328; Liebman, supra at 674.

A determination whether the Commonwealth bears this burden requires us to apply the four-factor analysis set forth in Donahue, 396 Mass. at 599.  We evaluate "[(i)] the potential unfairness to the defendant; [(ii)] the defendant's lack of access to the evidence; [(iii)] the burden on the prosecutor of obtaining the evidence; and [(iv)] the degree of cooperation between State and Federal authorities, both in general and in the particular case."  Id.  Applying the above analysis to this case, we conclude that each factor weighs against imposing the burden on the Commonwealth to secure the release of information related to N.F.'s status as a confidential Federal informant.

Under the first Donahue factor, we discern no unfairness to the defendant as a result of not receiving this information. Cf. Donahue, 396 Mass. at 599-600.  As a threshold matter, we

note that N.F.'s status as an informant was not withheld or otherwise hidden from the defendant in any way. The Commonwealth disclosed her status to the defendant, and defense counsel had the opportunity to depose N.F. to uncover the full nature of her relationship with the FBI. The defendant sought the informant records and corroborative testimony from Federal officers, however, for the sole purpose of establishing N.F.'s credibility as a witness in front of the jury. At trial, the judge permitted the defendant to admit N.F.'s status in evidence through her testimony. That status was not in any way contested. The judge ruled that he would not permit any additional evidence -- whether through documents or additional testimony -- detailing her work as an informant that would amount to vouching for her credibility. See United States v. Piva, 870 F.2d 753, 760 (1st Cir. 1989) (noting inappropriateness of use of government officials to vouch for credibility of their informants because evaluation of informant's credibility is up to jury). On direct examination, N.F. testified that she was indeed an informant and that she had worked as an informant for approximately two years and had been paid by Federal authorities on multiple occasions. N.F. also testified extensively about her observations on the morning of the shooting and forcefully denied any involvement by the defendant in the shooting. Accordingly, the information the

defense sought to use to establish N.F.'s status as an informant was cumulative of her uncontested testimony on this issue. The cumulative nature of the information was confirmed on the last day of trial when a redacted copy of N.F.'s informant records was produced to the defendant. The information contained in the unredacted portions of the records, at most, confirmed N.F.'s status as an informant and revealed a summary of the statement that she gave to a Federal agent concerning the shooting. This information was fully developed during N.F.'s deposition and at trial. Additionally, the officers whose testimony the defendant sought to compel were only authorized to testify on a limited basis and were not permitted to disclose the identities of confidential informants. The only arguably new information contained in the disclosed records included a reference to a separate individual, whom she named, as the shooter. This individual's alleged presence at the scene of the crime, however, was disclosed to the defense over one year earlier when the Commonwealth disclosed to the defendant that N.F. was an informant. The potential involvement of a third party in the shooting was also revealed by N.F. during her deposition. Despite this knowledge, defense counsel chose not to question N.F. about this individual's involvement during direct examination. The remaining portions of the records were redacted pursuant to Federal guidelines. To the extent that the

defendant argues that he was entitled to the disclosure of the unredacted portions of the file, he is mistaken. The defendant has not produced any evidence that the redacted portions of the file contained any relevant, let alone exculpatory, information. See Commonwealth v. Healy, 438 Mass. 672, 679 (2003) ("To prevail on a claim that the prosecution failed to disclose exculpatory evidence, the defendant must first prove that the evidence was, in fact, exculpatory"). The defendant was therefore not prejudiced by his inability to obtain this information before trial. See Commonwealth v. Vieira, 401 Mass. 828, 838 (1988) (no prejudice where substance of withheld evidence was cumulative of information already known to defendant).

On appeal, the defendant also argues that he was prejudiced by the failure to have this information at trial because it was needed to rehabilitate N.F.'s credibility after she contradicted her own testimony with regard to how long she was an informant. Specifically, after testifying on direct examination that she was an informant for at least two years and had been paid by the Federal government on multiple occasions, she testified on cross-examination that she had only been paid once.[16] This

---

[16] The defendant argued that the change in her testimony was the result of intimidation on the part of the Federal government and moved for a mistrial on that basis. The motion was denied. There was no evidence that Federal officers intimidated N.F.

contradiction did not put her status as a confidential informant in doubt, however, just the length of time that she was an informant and on how many occasions she was paid by Federal authorities -- both issues tangential to the case.  We do not believe that the defendant's access to the Federal records and testimony on N.F.'s informant status was therefore necessary to rehabilitate her credibility for these purposes, and instead may have presented other problems for the defense.  Indeed, admitting additional evidence on the length of time that she was an informant after her testimony on cross-examination concluded may very well have further undermined her credibility.  The fairness concerns present in other cases involving issues of dual sovereignty are therefore not present here.  See, e.g., Donahue, 396 Mass. at 599-600.

---

into lying or otherwise changing her testimony at trial.  The only evidence presented was that N.F. was told that a Federal officer was upset with her participation in the defendant's case, that she would not be paid again until after the trial ended, and that she was not to detail her payments or the information that she had given Federal officers in the past. This is not sufficient to show that she was intimidated into altering her testimony.  Indeed, the defendant's theory of intimidation is belied by the fact that the purported intimidation allegedly occurred before N.F. testified in the case.  Had she been intimidated as the defendant argues, one would not have expected her to testify to being an informant for approximately two years and receiving payments as she did on direct examination.  Accordingly, this theory does not support the defendant's contention that he was prejudiced by the failure to obtain the federally held information of N.F.'s status as an informant.

The second Donahue factor considers the defendant's lack of access to the sought-after evidence. Here, we conclude that this factor weighs heavily against imposing the burden on the Commonwealth to secure the disclosure of this information. The defendant was given an opportunity to depose N.F prior to trial. The record makes clear that the defendant also had ample time and opportunity to obtain the informant records and the substance of the sought-after testimony well before trial. Approximately eleven months before trial took place, the defendant was advised that obtaining this information from Federal authorities would require that he pursue it in accordance with Federal regulations. Indeed, he was reminded of the federally mandated procedure described several times, including by this court. See Ayala v. Commonwealth, 454 Mass. 1015, 1015 n.2 (2009) (noting that defendant "may have other means at his disposal to obtain the information he seeks. The Federal agencies have indicated that they would consider a request submitted by the defendant pursuant to [Federal regulations]"). See also United States ex rel. Touhy v. Ragen, 340 U.S. 462, 468 (1951) (upholding Federal regulation restricting ability of Federal authorities to disclose subpoenaed information). He did not, however, avail himself of the opportunity to obtain this information through the Federal procedure. Instead, he engaged in a year-long campaign to

compel this information through State proceedings.  The
defendant had a full and fair opportunity to retrieve this
evidence months before trial, but chose not to.  Indeed, when he
finally did comply with the Federal procedures at the start of
the trial, he received a redacted copy of N.F.'s informant
records and a notice authorizing the testimony of two Federal
officers a few days later.

The third Donahue factor requires us to evaluate the burden
on the prosecutor in obtaining the withheld information.  Under
this factor, we consider whether the prosecutor has a means of
access to the information held by Federal authorities that the
defendant does not.  See Donahue, 396 Mass. at 600.  Here, the
prosecutor would have been required to comply with the Federal
procedure as well.[17]  This case is therefore distinguishable from
cases where the burden on the prosecution to retrieve the
withheld information was minimal compared to the defendant.  See
id. (noting that while exculpatory information could not be
obtained by defendant, it "may well have been available to the
prosecutor on request").  There is no evidence in this case that
a request from the Commonwealth, rather than from the defendant,
would have precipitated the disclosure of the evidence.  In

---

[17] During argument before the start of trial, defense
counsel conceded that the prosecutor in this case "ha[d] done
whatever she could to procure evidence that is of exculpatory
nature."

fact, the record reveals the opposite. In response to discovery requests issued by the defendant that sought to determine whether other individuals at the party were also Federal informants, the prosecutor submitted requests for information related to these individuals in compliance with the Federal regulations. Rather than disclose this information, the FBI curtly informed the prosecutor that it "decline[d] either to confirm or deny whether [an individual] is or was an informant for the FBI." The burden on the prosecution was thus comparable to that on the defendant.

The fourth and final Donahue factor considers the degree of cooperation between State and Federal authorities, both in general and in the particular case. Where the cooperation between the two sovereigns is particularly strong, such as in a joint investigation of a defendant, we have determined that fairness dictates that the burden of securing the disclosure of the information held by Federal authorities falls squarely on the Commonwealth. See Lykus, 451 Mass. at 328. Here, however, there is no evidence of any cooperation between State and Federal authorities in the investigation or prosecution of the defendant's case. Although there was evidence that several Springfield police officers were deputized as Federal officers for the purposes of operating within the Federal gang task force, there was nothing to suggest that these officers played

any role in the defendant's case.  Because this case did not fall within the umbrella of matters under investigation by the task force, it cannot be said that the FBI "functioned as [an] agent[]" of the Commonwealth in this case.  Donahue, 396 Mass. at 599.

After weighing these factors, we conclude that the Commonwealth was not required to bear the burden of securing the release of the information concerning N.F.'s status as an informant from Federal authorities.  The defendant was not prejudiced by the nondisclosure, the defendant had ample opportunity to depose the informant and retrieve this information on his own, the Commonwealth would have been required to follow the same Federal procedures as the defendant to access the information, and the Federal government played no role in the investigation or prosecution of the defendant's case.  See Lykus, 451 Mass. at 328; Donahue, 396 Mass. at 598; Liebman, 379 Mass. at 675.  The trial judge therefore did not abuse his discretion in declining to require the Commonwealth to secure N.F.'s informant records from Federal authorities and in declining to compel the testimony of Federal law enforcement officers.

3.  Ineffective assistance of counsel.  Following his convictions, the defendant filed a motion for a new trial, arguing that his trial counsel had been ineffective.  The motion

advanced a litany of errors alleged to have been made by trial counsel.  Relevant to this appeal, the motion judge, who was not the trial judge, allowed an evidentiary hearing on trial counsel's failure to retain and call experts on eyewitness identification and ballistics.  The motion judge did not allow an evidentiary hearing, however, on trial counsel's failure to notice the absence of Perez's psychological records that were subject to disclosure after finding that the defendant had not raised a substantial issue warranting further hearing.  Following the evidentiary hearing, the motion judge denied the defendant's motion for a new trial.

On appeal, the defendant argues that the motion judge erred in denying his motion with respect to his arguments that his trial counsel was ineffective for (i) failing to retain and call an expert witness on the accuracy of eyewitness identifications, (ii) failing to retain and call an expert witness on ballistics evidence to testify about muzzle flashes, and (iii) failing to notice the absence of medical records that provided further insight into Perez's mental health issues and drug use.

Because the defendant was convicted of murder in the first degree, we do not evaluate his ineffective assistance claim under the traditional standard set forth in <u>Commonwealth</u> v.

Saferian, 366 Mass. 89, 96 (1974).[18]  See Commonwealth v. Seino, 479 Mass. 463, 472 (2018); Commonwealth v. Kolenovic, 478 Mass. 189, 192-193 (2017).  Instead, we apply the more favorable standard of G. L. c. 278, § 33E, and review his claim to determine whether there was a substantial likelihood of a miscarriage of justice.  Seino, supra.  Under this review, we first ask whether defense counsel committed an error in the course of the trial.  Id.  If there was an error, we ask whether it was likely to have influenced the jury's conclusion.  Id. at 472-473.

Where the claimed ineffectiveness is the result of a strategic or tactical decision of trial counsel, the decision must have been "manifestly unreasonable" to be considered an error.  Kolenovic, 478 Mass. at 193.  Commonwealth v. Holland, 476 Mass. 801, 812 (2017).  A determination on whether a decision is manifestly unreasonable requires an evaluation of the "decision at the time it was made" (citation omitted).  Holland, supra.  Only strategic and tactical decisions "which lawyers of ordinary training and skill in criminal law would not

---

[18] Under Commonwealth v. Saferian, 366 Mass. 89, 96-97 (1974), the standard is whether an attorney's performance fell "measurably below that which might be expected from an ordinary fallible lawyer" and, if so, whether such ineffectiveness has "likely deprived the defendant of an otherwise available, substantial ground" of defense.

consider competent are manifestly unreasonable" (citation omitted).  Id.

We conclude that any errors by the defendant's trial counsel did not create a substantial likelihood of a miscarriage of justice.  The defendant's motion for a new trial was therefore properly denied.  We address each of the defendant's arguments in turn.

a.  Eyewitness identification expert.  The defendant's motion for a new trial relied heavily on trial counsel's failure to obtain evidence from an expert on eyewitness identification. Had an expert been called, the defendant argues, the jury would have heard evidence on the variables that affect eyewitness identifications and would have had "further reason to doubt the reliability of Perez's identification."  Specifically, the defendant claims that an eyewitness identification expert would have testified to the theory of "transference," which suggests that Perez identified the defendant as the shooter only because of his earlier observations of the defendant during his altercation with the bouncers.  Additionally, the defendant contends that the expert would have testified to "the negative effects on accuracy of heightened stress and post-identification feedback," the "weak correlation of confidence to accuracy" of the identification, and the "chance of error by a single eyewitness."

The decision to call, or not to call, an expert witness fits squarely within the realm of strategic or tactical decisions.  See, e.g., Commonwealth v. Facella, 478 Mass. 393, 413 (2017) (decision not to call psychiatric expert reasonable strategic decision); Commonwealth v. Hensley, 454 Mass. 721, 739 (2009) (decision not to call expert strategic).  Accordingly, we evaluate whether the decision was "manifestly unreasonable" at the time it was made.[19]  Holland, 476 Mass. at 812.

We cannot say that trial counsel's decision not to call an expert on eyewitness identification was manifestly unreasonable when it was made.  At the evidentiary hearing, trial counsel testified that at the time of trial, he believed that N.F's testimony that the defendant was not at the scene at the time of the shooting, the inconsistencies of Perez's eyewitness account,

---

[19] The defendant contends on appeal that the motion judge incorrectly found that the failure to call an expert was a strategic decision.  The defendant's trial counsel offered contradictory testimony on this point at the evidentiary hearing.  In his affidavit, and on direct examination, trial counsel claimed that the failure to call an expert was not a strategic decision.  Trial counsel testified that, rather, he simply never considered whether to call one.  On cross-examination, however, he testified that he made the determination that an identification expert was not relevant to the case.  Given this conflicting testimony, we see no reason to disturb the motion judge's conclusion that not calling an expert on eyewitness identification was a part of the larger strategic decision to focus the defense on the testimony of N.F. and the cross-examination of Perez.  Commonwealth v. Perkins, 450 Mass. 834, 845 (2008) ("[W]e defer to [the motion] judge's assessment of the credibility of witnesses at the hearing on the new trial motion" [citation omitted]).

and Perez's mental health struggles would be sufficient to challenge the reliability of Perez's identification. To that end, trial counsel attacked Perez's identification of the defendant as the shooter, both on cross-examination and during closing argument. On cross-examination, trial counsel confronted Perez on his ability to accurately identify the shooter under the lighting conditions at the time of the shooting, his recollection of certain events that morning, and the discrepancies between Perez's statement to police on the morning of the shooting and his trial testimony regarding the defendant's height and clothing worn. Additionally, the defense presented evidence that Perez suffered from PTSD as a result of his military service and bipolar disorder. Specifically, trial counsel introduced evidence that Perez had sought counselling for his mental health struggles approximately 161 times over an eight-year period and that he began taking medication for these issues a few months after the shooting. Finally, during closing argument, trial counsel argued that Perez's identification was unreliable. He argued that in light of Perez's mental health struggles, the "collective experience" of the jurors could lead them to conclude that "those are difficult illnesses and they may impact his ability to see and conceptualize what was actually happening." He also argued that Perez had made a mistaken identification.

The reliability of Perez's identification was vigorously challenged through this strategy.[20]  Cf. Commonwealth v. Watson, 455 Mass. 246, 257-259 (2009) (decision not to seek funds for expert on eyewitness identification not manifestly unreasonable where reliability of identification challenged on cross-examination and in closing argument).  Accordingly, we cannot say that trial counsel's decision not to call an expert on eyewitness identification was one that "lawyers of ordinary training and skill in criminal law would not consider competent" (citation omitted).  Holland, 476 Mass. at 812.  See Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015), S.C., 478 Mass. 189 (2017) ("[R]easonableness does not demand

---

[20] We also note that, as the motion judge concluded, at the time of trial in 2009, the retention of experts on eyewitness identification was not as prevalent as it is today.  See Commonwealth v. Holland, 476 Mass. 801, 812 (2017) ("[We] make every effort . . . to eliminate the distorting effects of hindsight" in evaluating whether decision is manifestly unreasonable [quotation and citation omitted]).  Indeed, trial counsel testified that he had never retained an expert on eyewitness identification, despite having decades of experience as an attorney and having tried over forty murder cases.  At the time of trial, counsel had the benefit of neither the Report and Recommendations of the Supreme Judicial Court Study Group on Eyewitness Evidence (July 25, 2013) nor our decision in Commonwealth v. Gomes, 470 Mass. 352, 354, 363-364 (2015), that highlighted the preference for expert testimony or, in the absence of such testimony, specific jury instructions regarding the reliability of eyewitness identifications.  Finally, Perez clearly identified the defendant correctly as the person who threatened to come back and "light" the party "up" when he was removed.  The primary issue of identification related to the transference theory.

perfection. . . . Nor is reasonableness informed by what hindsight may reveal as a superior or better strategy"). Accordingly, the decision was not manifestly unreasonable at the time it was made.

b. <u>Ballistics expert</u>. The defendant also argues that his trial counsel was ineffective for failing to call a ballistics expert who would testify that a muzzle flash fired from a semiautomatic handgun was unlikely to provide sufficient illumination to allow an individual to adequately see the face of the shooter. We need not decide whether the decision not to call a ballistics expert was a manifestly unreasonable one because, even assuming that it was, we conclude that it was not likely to have influenced the jury's conclusion. See <u>Seino</u>, 479 Mass. at 472-473.

As we discussed in depth <u>supra</u>, there was a significant amount of independent evidence establishing that the crime scene was illuminated at the time of the shooting. For example, a police officer testified that the street lights near the location of the shooting and the exterior lights on a nearby building were illuminated when he arrived at the crime scene at approximately 4:30 <u>A</u>.<u>M</u>. -- only approximately one and one-half to two hours after the shooting occurred. Additionally, the jury heard evidence that suggested the area in front of the home was illuminated enough to permit N.F. and Perez to independently

identify the defendant from the porch on the second floor while the defendant was standing on the street outside.  Even assuming that an expert would have testified that Perez was unlikely to have been able to see the shooter solely from the muzzle flash, the jury were not likely to have been influenced by this testimony in light of the other evidence that the crime scene was lit at the time of the shooting.  Accordingly, we conclude that any error in failing to call a ballistics expert did not create a substantial likelihood of a miscarriage of justice.

c.  <u>Evidence of mental health struggles and drug use</u>.  Finally, the defendant argues that his trial counsel was ineffective for failing to notice that certain psychological records detailing Perez's history of mental health struggles and drug use mistakenly had been withheld despite a court order compelling their disclosure.  Without these records, the defendant argues, trial counsel was unable to explore the full extent of how Perez's mental health and drug use could have affected his "ability to accurately perceive and identify the shooter."  The motion judge denied the defendant's motion for a new trial without conducting an evidentiary hearing on this argument.  He concluded that because these issues were sufficiently before the jury, the additional records would not have "added to the information already at [trial counsel's] disposal and used in cross-examination at trial."  We agree.

As discussed supra, Perez's PTSD and bipolar disorder diagnoses were both brought out on cross-examination at trial. Specifically, Perez testified that he had been diagnosed with PTSD and bipolar disorder, that he received counselling and medication to treat the diagnoses, and that he had had a counselling session on the day after the murder. He further testified that over the period of approximately eight years following his discharge from the military, he had sought counselling for his PTSD 161 times and that he suffered from "night terror[s]" and sleeplessness as a result of his PTSD.[21] Additionally, he testified that he used marijuana to cope with the effects of his PTSD diagnosis.

Notably, there was no evidence -- either introduced at trial or contained within the missing records -- that suggests that Perez's mental health struggles or drug use affected his ability to perceive the defendant on the morning of the shooting. For example, a defense expert's proffered testimony

---

[21] At the evidentiary hearing on the defendant's motion for a new trial, trial counsel testified that, at the time of the trial, he believed it would have been a poor tactical choice to "attack" Perez in front of the jury, given that Perez was a veteran suffering from posttraumatic stress disorder (PTSD). Therefore, it is unlikely that trial counsel would have used the information in the missing records to further attack Perez's ability to perceive the shooter due to his PTSD diagnosis even if counsel had them. See Commonwealth v. Duran, 435 Mass. 97, 106 (2001) (rejecting claim that counsel was ineffective for failing to "attempt to use every conceivable method" to impeach sympathetic witness).

only acknowledged that Perez's mental health struggles "had the potential to and may have interfered with Mr. Perez's abilities to accurately perceive or recollect the [shooting]." Trial counsel argued this point specifically during closing, stating that Perez's diagnoses "are difficult illnesses and they may impact his ability to see and conceptualize what was actually happening." Additionally, although the missing records suggested that Perez was more dependent on marijuana than his testimony let on, there was no evidence that he was under the influence of marijuana on the morning of the shooting. The defendant's proffered expert on this point would not have materially added to the defense, as he was prepared only to testify that individuals have a reduced ability to accurately perceive reality and recall past events while under the influence of mind-altering substances. Because the substance of the missing records and proffered expert testimony was already presented to the jury, any error on the part of trial counsel in failing to notice the missing records was not likely to influence the jury's conclusion. See Commonwealth v. Williams, 453 Mass. 203, 212-213 (2009) (rejecting ineffective assistance of counsel claim based on counsel's failure to introduce records where substance of records was already before the jury). The motion judge therefore did not err in denying the defendant's motion for a new trial.

4.  Review under G. L. c. 278, §33E.  After a thorough review of the record, we find no reason to exercise our authority under G. L. c. 278, § 33E, to grant a new trial or to reduce or set aside the verdict of murder in the first degree.  Pursuant to this duty, however, we deem it necessary to address one of the arguments raised by the defendant during the motion for a new trial, but not raised on appeal.

In his motion for a new trial, the defendant argued that his trial counsel's failure to request an "honest but mistaken identification" jury instruction constituted ineffective assistance of counsel.  This instruction arose from our decision in Commonwealth v. Pressley, 390 Mass. 617, 620 (1983), wherein we declared that "[f]airness to a defendant compels the trial judge to give an instruction on the possibility of an honest but mistaken identification" where identification was "crucial to the Commonwealth's case."  We held that this instruction must be given "when the facts permit it and when the defendant requests it."  Id.  Here, the facts permitted such an instruction.  The defendant did not, however, request it.  We therefore review to determine if this error produced a substantial likelihood of a miscarriage of justice.  Commonwealth v. Penn, 472 Mass. 610, 625-626 (2015).  We conclude that it did not.

As the motion judge concluded, the trial judge described various factors that the jury should consider in assessing the

identification evidence and "made clear that the jurors must be satisfied beyond a reasonable doubt of the accuracy of the identification of [the defendant] before they could convict him."  Moreover, the defendant's trial counsel specifically argued mistaken identification in closing and cross-examined Perez on his ability to accurately perceive the shooter.  Accordingly, "we are substantially confident that, if the error had not been made, the jury verdict would have been the same" (citation omitted).  Penn, 472 Mass. at 626.  Cf. id. at 625-626 (no likelihood of substantial miscarriage of justice where honest mistake was focus of defendant's cross-examination of eyewitness and closing argument).  We therefore conclude that trial counsel's failure to request the "honest but mistaken identification" instruction did not create a substantial likelihood of a miscarriage of justice.

Conclusion.  For these reasons, we affirm the defendant's convictions and the denial of the defendant's motion for a new trial.

So ordered.